POWELL ET AL., RECEIVERS, *v.* UNITED STATES
ET AL.

No. 295.   Argued January 12, 1937.—Decided March 1, 1937.

*Messrs. Charles T. Abeles* and *W. R. C. Cocke* for appellants.

*Assistant Attorney General Dickinson,* with whom *Solicitor General Reed* and *Messrs. Elmer Collins, Wendell Berge, E. M. Reidy,* and *Daniel W. Knowlton* were on the brief, for the United States and Interstate Commerce Commission, appellees.

*Mr. T. M. Cunningham,* with whom *Mr. A. R. Lawton, Jr.,* was on the brief, for H. D. Pollard, Receiver of Central of Georgia Ry. Co., appellee.

MR. JUSTICE BUTLER delivered the opinion of the Court.

In proceedings initiated on complaint of the receiver of the Central of Georgia Railway Company, the Interstate Commerce Commission ordered to be "stricken from

the files" a tariff filed by the receivers of the Seaboard Air Line Railway Company. The tariff extended Fort Benning Junction switching limits to include receiving and delivery tracks at Fort Benning military post. It was stricken on the ground that it extended to a station and covered transportation not on the line of the Seaboard in violation of § 6 (1) of the Interstate Commerce Act.[1] 206 I. C. C. 362. To annul that order the Seaboard brought this suit. The United States answered that the order is not reviewable and prayed dismissal of the complaint. The commission appeared and by its answer supported the order. The Central intervened; its answer contained, in what purports to be a counter-claim under Equity Rule 30, allegations appropriate for a complaint in a suit under § 1 (20) of the Act to prevent a violation of § 1 (18).[2] The Seaboard moved to

---

[1] § 6 (1) "Every common carrier . . . shall file with the commission . . . schedules showing all . . . charges for transportation between different points on its own route and between points on its own route and points on the route of any other carrier by railroad . . . when a through route and joint rate have been established. . . . The schedules . . . shall plainly state the places between which property . . . will be carried . . . and . . . state separately all terminal charges . . . and all other charges which the commission may require, all privileges or facilities granted or allowed, and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such . . . charges, or the value of the service rendered . . ." [49 U. S. C. 6 (1)]

§ 6 (7) "No carrier . . . shall engage or participate in the transportation of . . . property . . . unless the . . . charges . . . have been filed . . . nor shall any carrier . . . collect . . . different compensation for such transportation . . . or for any service in connection therewith, between the points named in such tariffs than the . . . charges which are specified in the tariff filed and in effect at the time . . ." [49 U. S. C. 6 (7)]

[2] 1 (18) "No carrier by railroad . . . shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this chapter over or by means of

strike out the counterclaim on the grounds, among others, that it is not related to the cause of action alleged in the complaint, is not pleadable under Rule 30, and is not within the jurisdiction of a court of three judges under 28 U. S. C., § 47.

The case was tried by a court of three, a circuit judge and two district judges. After hearing the evidence, the court in an opinion from which the circuit judge dissented held the order valid on the grounds that the tariff aided the Seaboard to violate § 1 (18) of the Act and that it unduly impaired the Seaboard's line haul revenue in violation of § 4 (1) of the Emergency Railroad Transportation Act, 1933, 48 Stat. 212. 12 F. Supp. 938. It entered a final decree denying the motion of the United States to dismiss and the motion of the Seaboard to strike out the counterclaim, declared the order valid and, in accordance with the prayer of the counterclaim, enjoined the Seaboard from extending its line from the junction to the receiving and delivery tracks at Fort Benning and from operating the line between these points without obtaining from the commission a certificate of public convenience and necessity, and from using the tariff and carrying out a contract for the use of the

---

such additional or extended line of railroad, unless and until there shall first have been obtained from the commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line of railroad . . ." [49 U. S. C. 1 (18)]

§ 1 (20) " . . . Any construction, [or] operation . . . contrary to the provisions of . . . paragraph (18) . . . may be enjoined by any court of competent jurisdiction at the suit of the United States, the commission, any commission or regulating body of the State or States affected, or any party in interest . . ." [49 U. S. C. 1 (20)]

§ 1 (22) "The authority of the commission, conferred by paragraphs (18) to (21) . . . shall not extend to the construction . . . of spur, industrial, team, switching or side tracks, located or to be located wholly within one State . . ." [49 U. S. C. 1 (22)]

tracks between the junction and the fort as devices to avoid the need of such a certificate.

The questions for decision are:

Is the Seaboard's suit to set aside the commission's order within the jurisdiction of the lower court? If so, may its decree upholding the order be sustained?

Is the Central's counterclaim against the Seaboard within the jurisdiction of the district court of three judges under 28 U. S. C., § 47?

Fort Benning is a United States military post in Georgia; the reservation includes 98,000 acres and has a population of more than 7,500. A railroad 6.8 miles long, built and owned by the United States, connects receiving and delivery tracks at the post, Fort Benning, with a station, Fort Benning Junction, at the intersection of the lines of the Seaboard and the Central. For more than eight years prior to October 16, 1932, the line between the junction and Fort Benning was operated by the Central under a license granted by the Secretary of War. The Central made Fort Benning a station on its system. For transportation between the junction and that station the Central collected arbitraries fixed by it in addition to the tariff charges applicable between the junction and points of origin or destination. Most of the freight handled was inbound. The Seaboard ceased to use its connection at the junction and interchanged traffic to and from Fort Benning with the Central at Columbia, about four miles from the junction.

In October, 1932, the Secretary of War revoked the Central's license and arranged to have the railroad operated by contractors, Page and Harris. He leased to them the line in question, and they agreed to transport all freight to and from the junction. They undertook to organize a corporation and to have it apply to the commission for a certificate of public convenience and necessity to acquire and operate the line as a common carrier

and then, by agreements with other carriers, to put in effect through routes and joint rates to and from Fort Benning as low as those to and from the junction and, out of its share of the rates so established, to take its pay for transportation performed by it.

Page and Harris organized the Fort Benning Railroad Company and caused it to apply for a certificate. The Seaboard gave assurances that it would join the new company in establishing through rates and divisions. The Central intervened in opposition. The application was granted by a division of the commission. 193 I. C. C. 223. But, on reargument before the entire commission, the certificate was rescinded and the application denied. 193 I. C. C. 517. The applicant never operated the line.

Shortly after the failure of the contractors' company to establish itself as a common carrier, the Seaboard filed the tariff in question, to become effective December 4, 1933. Under date of June 7, 1934, it made a contract with Page and Harris, stipulated to have been in force since the effective date of the tariff, whereby the latter agreed to act as its agents for transportation of freight between the junction and the receiving and delivery tracks named in the tariff. It agreed to pay them $12.50 for each loaded or partly loaded car handled in either direction or one-half of the gross revenue when the amount earned by the car was less than $25.

Paragraph (8) of the contract provides that when the Seaboard so desires, but subject to approval by the Secretary, it shall have the right, upon payment of reasonable compensation to Page and Harris, to perform switching service with its own engines and crews over the leased tracks. By paragraph (14) of the contract Page and Harris reserve the right, subject to the Secretary's approval, to render like service for the Central or any other common carrier. The Secretary approved

paragraph (8) subject to the reservation in paragraph (14) and to the condition that Page and Harris should ever hold themselves out as willing and ready to contract on similar terms with the Central or any other common carrier railroad.

The Central's complaint initiating the proceedings which resulted in the challenged order assailed the tariff on the grounds that it and the contract with Page and Harris constitute a device to avoid the commission's refusal to grant the Fort Benning Railroad Company a certificate of convenience and necessity; that by it the Seaboard seeks to extend its line to Fort Benning without obtaining a certificate and that it does not comply with § 6 (1) because it is obscure and ambiguous and fails to state the charges to be absorbed by the Seaboard or the compensation to be paid to Page and Harris. The complaint prayed cancelation of the tariff and cease and desist orders against the Seaboard and Page and Harris. It is obvious from the allegations and prayer of the complaint, as well as from its contentions before the commission, that the Central sought to have the commission prohibit the use by the Seaboard or its agents of the line between the junction and the fort because in violation of § 1 (18).

The commission's report states: The Seaboard employs Page and Harris as its agents and pays them for performance of transportation over the leased line and that service is common carrier service within the jurisdiction of the commission. The Central has not filed a similar tariff and does not perform or bear the cost of service corresponding to that covered by the Seaboard's tariff. Before the Seaboard could lawfully operate the line from the junction to the fort, it would have to obtain a certificate of convenience and necessity. But the commission did not decide whether, on that ground, it had jurisdiction to order the Seaboard or Page and Harris to

284

cease and desist or to suspend or set aside the tariff. It said (206 I. C. C. at p. 367): "Our finding of unlawfulness of the tariff . . . is not predicated on the fact that the Seaboard has violated section 1 (18), but rather on the fact that it has published rates to and from Fort Benning, a station not on its line and which cannot be reached by it or any other common carrier, and consequently it cannot pay out of its line-haul rates for a service which it is not legally obligated to perform and which it cannot perform except through the employment of the contractors with the Government." It added that approval by the Secretary of War of the contract between the Seaboard and Page and Harris "granted no rights to the Seaboard to operate over the track in question. Manifestly the War Department could take no action on a subject matter which the Congress has placed under our exclusive jurisdiction." The commission did not find that the tariff imposed any unreasonable burden upon the revenues of the Seaboard or connecting carriers or that the services covered by it would be performed for less than reasonable compensation or that its use would result in any disadvantage to shippers, carriers or the public.

1. The United States and the Interstate Commerce Commission contend that the commission's order is not reviewable under the statute.[3] They do not suggest that the order is a negative one or that the commission did not make an utterance which in form purported to be an order. But they say that it is not directed to any party; it requires no one to do or to refrain from doing any act; it could not be enforced, obeyed or disobeyed; it did not speak to the future or contemplate any future effect because, on and after the date it was made, it had no

---

[3] See 28 U. S. C. §§ 41 (28), 43, 44, 45, 45a, 47, 47a, 345. Cf. § 380.

significance "except as a record of a certain completed act performed by the Commission."

But overemphasis upon the mere form of the order may not be permitted to obscure its purpose and effect. By it the commission meant to put an end to the tariff in question and the service of the Seaboard according to its terms. The tariff was a rule binding the Seaboard to furnish transportation to and from the fort for charges under other tariffs applicable to and from the junction. The order would eliminate that rule and substitute for it terms of the tariffs applicable prior to its effective date. In effect the order grants the relief sought by the Central's complaint; it confines the Seaboard's service within the junction switching limits, denies leave to that carrier to furnish, and prevents it from furnishing, transportation to and from Fort Benning. Interpreted according to its purpose, the order is in substance and effect an affirmative one and therefore reviewable under the statute. *Chicago Junction Case,* 264 U. S. 258, 263. *Intermountain Rate Cases,* 234 U. S. 476, 490. *United States* v. *New River Co.,* 265 U. S. 533, 539–541. *Alton R. Co.* v. *United States,* 287 U. S. 229, 237. It is clear that the district court of three judges had jurisdiction to entertain the Seaboard's suit.

2. As to the validity of the order. The commission held the tariff violated § 6 solely because it covered service and published rates to and from a station, Fort Benning, found not to be on the line of the Seaboard. It may be assumed that, unless the record conclusively shows that the leased tracks constitute a part of the Seaboard's line within the meaning of § 6, the tariff was not authorized and the commission's order should be sustained. In substance, the facts found are: The United States leased the line to Page and Harris. With the approval of the Secretary, the lessees were employed by the

Seaboard as its agents to transport freight over the leased tracks, and the Seaboard was given the right to perform the transportation with its own engines and crews. Page and Harris reserved the right to render for the Central and other carriers service like that furnished by them as agent of the Seaboard, and were required by the Secretary to contract with such carriers on terms similar to those made with the Seaboard. The commission rightly held that in respect of the traffic covered by the tariff Page and Harris as the Seaboard's agents were common carriers and they and the service performed by them were subject to its jurisdiction.

Whether the leased tracks be, within the meaning of § 1 (18), an extension or addition, or, within the meaning of § 1 (22), spur, industrial, team, switching or side tracks, it is clear that the transportation over them by or for the Seaboard is required to be covered by a tariff filed in accordance with the Act. § 6 (7). The action of the Secretary was not inconsistent with proper exertion of the commission's authority to grant or withhold a certificate of public convenience and necessity for the use of the leased tracks by or for the Seaboard as required by § 1 (18) or to bring suit under § 1 (20) to enforce that paragraph. It follows that, § 1 (18) aside, the leased tracks covered by the tariff constitute a part of, and extend to or include a station on, the line of the Seaboard within the meaning of § 6. Indeed, there is nothing in the commission's report or in the briefs of appellees that tends to give support to the view that, if § 1 (18) had not been enacted, the tariff would not be valid.

As to the bearing of § 1 (18) on the validity of the tariff. The United States and the commission argue that the Seaboard cannot, by the arrangement for the use of the leased tracks, place Fort Benning on its line, because thereby the Seaboard extends its line and § 1 (18) prohibits an extension without the commission's approval;

that the tariff offers a service that cannot legally be performed because the extension, not having been approved, is forbidden by that paragraph. And they say that, since the carrier is required to furnish whatever service is covered by its tariffs, the inclusion of that within the Seaboard's extended switching limits would compel the carrier to perform an act prohibited by § 1 (18), and this the commission may not permit. The purpose of §§ 1 (18) to 1 (22) of the Act was to empower the commission in proceedings instituted by a carrier proposing to engage in transportation over or by means of an additional or extended line authoritatively to decide whether it would be in the public interest. Unless the project is one covered by § 1 (18), the commission is not authorized by the Act to consider whether it is in the public interest and, for lack of jurisdiction to determine that question, it must deny the application. Upon presentation by the carrier of application for a certificate, the commission, for the purpose of determining whether it is authorized by the Act to consider the merits, may pass incidentally upon the question whether the project is one covered by § 1 (18). But the decision of that question is for the court in either a suit to set aside an order granting a certificate or in a suit under § 1 (20) to enjoin a violation of § 1 (18). The function of the court is to construe that paragraph; that of the commission is to determine whether the project, if it is one covered by the paragraph, is in the public interest. The Central was not authorized by the Act to initiate a proceeding before the commission to determine whether the Seaboard's use of the leased tracks was or would be in the public interest. If application for a certificate had been made, the Central could have appeared in opposition. The Seaboard not having made application, the Central's sole remedy was a suit under § 1 (20). That paragraph provides the only method for enforcing § 1 (18). It de-

clares that any construction or operation contrary to § 1 (18) may be enjoined at the suit of the United States, the commission, the regulating body of the State affected or any party in interest. *Texas & Pacific Ry.* v. *Gulf, C. & S. F. Ry.*, 270 U. S. 266, 271–274. *Piedmont & Northern Ry.* v. *United States,* 280 U. S. 469, 476 *et seq. Chesapeake & Ohio Ry.* v. *United States,* 283 U. S. 35, 42. *Western Pacific California R. Co.* v. *Southern Pacific Co.,* 284 U. S. 47. *St. Louis S. W. Ry.* v. *Missouri Pacific R. Co.,* 289 U. S. 76, 81, 82. *Transit Commission* v. *United States,* 289 U. S. 121. *United States* v. *Idaho,* 298 U. S. 105, 109.

The contention of the United States and the commission comes to this: Fort Benning is not a station on the Seaboard's line because by use of the tariff and the leased tracks the carrier violates § 1 (18). Since the tariff extends to a station not on the carrier's line, it violates § 6. Therefore the commission rightly ordered the tariff to be stricken from its files. Plainly that begs the question. It takes for granted a violation of § 1 (18), a fact not established and one which the commission had no jurisdiction to determine. The contention is fallacious and must be rejected.

Plainly, the Central mistook its remedy. By its complaint against the tariff it sought an order of the commission equivalent to a decree of court in a suit under § 1 (20) enjoining the Seaboard from extending its service because contrary to § 1 (18). The order, as construed and supported by appellees, is the practical equivalent of such a decree. The governing statutory provisions do not permit substitution of the commission's order for a decree of court. The remedy provided by § 1 (20) is clearly inconsistent with a proceeding before the commission to attain the same end. Suits under that paragraph may not be tried before three judges. Those under the Urgent Deficiencies Act (28 U. S. C., § 47) to set aside orders

of the commission cannot be tried in any other court. In suits under § 1 (20), appeals must be taken to the Circuit Court of Appeals. Appeals from district courts of three judges must be taken to this court. The statutes cannot be construed to give the commission, a carrier or other party seeking to enforce § 1 (18) a choice of remedies; i. e., between a proceeding before the commission to invalidate the applicable tariff and a suit under § 1 (20). The latter is exclusive.

The gravamen of the Central's complaint is not that the Seaboard is engaging in transportation like that furnished by the Central before the Secretary revoked its license. But it is that the Seaboard does it without additional charges. There is nothing in the findings of the commission to suggest that the tariff unduly burdens the Seaboard's revenue or that it is unreasonable or unjustly discriminatory. Its findings on the Fort Benning Railroad Company's application although put in evidence are not findings in the proceeding in which was made the order in question and have no bearing on the validity of the tariff under consideration. The lower court erred in sustaining the commission's order on the ground that the "tariff unduly impairs the line haul revenue." The commission did not so find. The order cannot be sustained.

3. The counterclaim was not properly before the court and could not be entertained as an incident to or part of the suit to set aside the commission's order respecting the tariff.

The Seaboard's bill merely assails the commission's order. The issue between the original parties is confined to its validity. The suit is a statutory one triable only in a specially constituted court. The counterclaim is based on a violation of § 1 (18); the facts alleged are not sufficient to constitute a cause of action within the jurisdiction of that court. *Pittsburgh & West Virginia Ry.*

v. *United States,* 281 U. S. 479, 488. Moreover, the counterclaim does not arise out of the transaction that is the subject of the suit and is not germane or related to it. Equity Rule 30 cannot reasonably be construed to authorize intervening defendants, in a suit to set aside an order of the commission, to set up counterclaims not arising out of or related to the subject matter of the suit. That would permit complications likely to burden and impede and would be contrary to the purpose and intent of the rule. *Chandler & Price Co.* v. *Brandtjen & Kluge, Inc.,* 296 U. S. 53, 59. The counterclaim, not being within the jurisdiction of the specially constituted court, should have been dismissed for want of jurisdiction. *Pittsburgh & West Virginia Ry.* v. *United States, ubi supra.*

Complainants were entitled to the judgment and decree of the specially constituted court declaring that the commission's order striking the tariff from its files is illegal and void and setting aside and annulling the same.

*Reversed.*

Mr. Justice Brandeis and Mr. Justice Stone took no part in the consideration or decision of this case.

Mr. Justice Cardozo is of the opinion that the decree should be modified by striking the counterclaim of the intervening defendant, and as so modified, affirmed.