GRIFFIN et al. v. UNITED STATES.

No. 45622.

Court of Claims.

April 5, 1948.

198

Moultrie Hitt, of Washington, D. C. (G. Kibby Munson, of Washington, D. C., on the brief), for plaintiffs.

D. B. MacGuineas, of Washington, D. C., and John F. Sonnett, Asst. Atty. Gen. (Armistead B. Rood, of Washington, D. C., on the brief), for defendant.

Before JONES, Chief Justice, and LITTLETON, WHITAKER, MADDEN, and HOWELL, Judges.

LITTLETON, Judge.

The railroad for which the plaintiffs are receivers is a common carrier,. and, during the period April 1, 1931, to February 28, 1938, here involved, as such a carrier transported mails for the Government. 39 U.S.C.A. §§ 537–539.

The mails were not transported under special contracts, as had been the practice in earlier times, but were carried under and pursuant to the provisions of the Railway Mail Pay Act of July 28, 1916, 39 Stat. 412, on the basis of car space authorized and distance moved.

This Act provided, Id. 429, 39 U.S.C.A. § 541:

"All railway common carriers are hereby required' to transport such mail matter as may be offered for transportation by the United States in the manner, under the conditions, and with the service prescribed by the Postmaster General and shall be entitled to receive fair and reasonable compensation for such transportation and for the service connected therewith." ·

The same Act stated, Id. 431, 39 U.S.C.A. § 563:

"That it shall be unlawful for any railroad company to refuse to perform mail service at the rates or methods of compensation provided by law when required by the Postmaster General so to do, and for such offense shall be fined $1,000. Each day of refusal shall constitute a separate offense."

Under these, and other statutory conditions, the plaintiffs transported mail tendered by the United States. The tender could not be refused except under heavy penalty, and the terms used in the record to describe such a statutory tender, such as "order" or "authorization" have essentially one meaning which derives its scope, definition and force from the statutory requirements that compelled obedience. The carrier had no choice in the matter. That which protected the carrier was the provision for "fair and reasonable compensation," and, of course, the Fifth Amendment.

The Interstate Commerce Commission was by the statute, 39 U.S.C.A. § 542, empowered and directed to establish "rates and compensation" for the mail service, and in doing so was given power as follows, Id. 430, 39 U.S.C.A. § 554:

· "For the purpose of this section the Interstate Commerce Commission is hereby vested with all the powers which it is authorized by law to exercise in the investigation and ascertainment of the justness and reasonableness of freight, passenger, and express rates to be paid by private shippers."

In considering the subject of mail pay the Commission was required to hold hearings,

of which the interested carriers were to receive notice and give response thereto. The statute provided, Id. 430, 39 U.S.C.A. § 549:

"For the purpose of determining and fixing rates or compensation hereunder the commission is authorized to make such classification of carriers as may be just and reasonable and, where just and equitable, fix general rates applicable to all carriers in the same classification."

The Postmaster General was required, 39 U.S.C.A. § 546, to furnish the Commission with necessary data, so that all interested parties were brought together and as well informed as might be.

While the Act left to the Commission the task of classifying the carriers, the Act itself classified the type of service to be compensated for. There were five of these classifications, although two only are here directly involved. These two are (1) apartment railway post office car service, and (2) closed-pouch service. The Act defined apartment railway post office car mail service as service by apartments less than forty feet in length in cars constructed, fitted up, and maintained for the distribution of mails on trains, with two standard-sized apartments, one 15-feet long and another 30 feet in length. Closed-pouch mail service was therein defined as transportation and handling by railroad employees of mails on trains on which full or apartment railway post office cars were not authorized, with exceptions noted, the authorizations for closed-pouch service to be for units of seven feet and three feet in length, both sides of car.

Maximum rates for the service were set forth in the Act. The statutory procedure for the establishment of rates and compensation appears in time to have been complied with, and the Interstate Commerce Commission set up three classifications of railroad mail carriers.

There is some confusion in the record over the denominations of these classifications. The form of annual report prepared by the Commission defines Class I companies as those having annual operating revenues above $1,000,000, Class II companies as those having annual operating revenues from $100,000 to $1,000,000, and Class III companies as having annual operating revenues below $100,000.

However, classification by the Commission for mail pay purposes was otherwise. One class embraced railroads more than 100 miles in length, another separately operated railroads 50 to 100 miles in length, and another separately operated railroads less than 50 miles in length. Because of its revenues plaintiffs' railroad was, at least for a time, a Class I railroad for reporting purposes, and for mail pay purposes it was classed as a road exceeding 100 miles in length. But the Commission's decision of July 10, 1928, 144 I.C.C. 675, 716, shows that this use of mileage as determining classification was not absolute.

The conversion from a weight basis to a space basis for computing a fair and reasonable compensation for carriage of the mails required investigation and consideration. It must be borne in mind that the space basis was not a matter of tenancy. It was to be used for the purpose of paying for transportation. Transportation was the heart of the matter, and space only a factor in the measure or yardstick used.

The Postmaster General devised three formulae for application of the space basis to transportation of the mails. They were termed "plans," and are described in the findings. Plan No. 2 is the one with which we are here concerned for it is the one adopted in substance by the Interstate Commerce Commission, and it was on the basis of that plan that rates were derived for transportation of the mails.

All this, of course, required an extended investigation both on the scene of operations throughout the country, and in the responses and the reports made by the carriers to the Commission from time to time.

Since this was a comparatively new undertaking it was found necessary by the Commission to group and to generalize. To establish individual, specific rates from point to point would have been a stupendous proposition. Innumerable rates on freight from point to point were already in effect, but they were a growth of many years and founded on decades of experience. It is obvious that if all freight tariffs were destroyed and rate experts and all others

utterly forgot what was in them, the establishment of new freight rates could not be accomplished in short order. A sizable proportion of the mails had come to be the parcels post and this naturally included articles theretofore carried by the railroad originally as freight. The consequent substitution of mail pay in place of freight collections could not justify undue decrease of earnings.

The task before the Interstate Commerce Commission in establishing mail pay was simplified by the scheme or plan authorized by Congress to group the railroads by class. The plaintiffs' railroad was some 400 miles in length, that is to say over 100 miles, and it was therefore placed in the same class as the major railroads of the country. For reasons which will hereinafter appear we have little if any criticism to make of this classification. It may have been too arbitrary and too general, but we cannot revise it. We are not informed as to why the division line of 100 miles was adopted rather than some other line of cleavage. But it was not a sliding scale.

After hearings upon the matter thus authorized by Congress to be investigated and passed upon, the Interstate Commerce Commission came to a decision December 23, 1919, which is reported 56 I.C.C. 1, being given docket No. 9200.

By this decision the Postmaster General was required to use the space basis on all steam railroads, and for roads in whose class plaintiffs' railroad was placed the Commission found that the fair and reasonable rates of payment for transportation of mail matter as of November 1, 1916, and to January 1, 1918, were 10 cents per mile of service by a 15-foot apartment car and 3 cents per mile of service by a 3-foot closed-pouch space. There were other space-rates prescribed, of course, but here we are concerned with a 15-foot apartment and a 3-foot closed-pouch space. After January 1, 1918, the rates were to be 25 percent additional, bringing those here involved to 12.5 cents and 3.75 cents respectively. These rates remained in effect for some time, until the railroads asked for a re-examination.

On July 10, 1928, upon a re-examination, the Commission raised the rates for roads of plaintiffs' class by 15 percent, so that the rates of 12.5 cents on 15-foot apartment cars were raised to 14.5 cent per mile, and 3.75 cents on closed-pouch service to 4.5 cents per mile. These were prescribed as fair and reasonable rates to be received on and after August 1, 1928, for all roads of plaintiffs' class. This determination was carried under the original docket number 9200, and is published 144 I.C.C. 675.

The plaintiffs became dissatisfied with the operation of these rates and on April 1, 1931, applied to the Commission for a re-examination and redetermination of rates as they affected the Georgia & Florida Railroad and asked for the establishment of fair and reasonable rates. This the plaintiffs could do under the Act of July 28, 1916, 39 Stat. 412, 430, 39 U.S.C.A. § 553.

An investigation was made and the Commission came to a decision in the matter May 10, 1933, docket No. 9200, 192 I.C.C. 779, denying increased compensation.

In all these investigations Plan No. 2 was adhered to. The plaintiffs petitioned for a reconsideration, which was denied October 3, 1933.

Thereafter, March 3, 1934, the plaintiffs commenced an action in equity in the District Court of the United States for the Southern District of Georgia, Augusta Division, in which they sought a decree setting aside the Commission's order of denial and requiring further proceedings. They were successful in this action and on March 12, 1935, the Commission reopened the case. Decision was rendered February 4, 1936, 214 I.C.C. 66, docket No. 9200, in which the Commission adhered to its former position and denied the application. The only additional matter introduced in evidence at that hearing appears to have been certain rules governing the separation of operating expenses between freight and passenger services.

The plaintiffs thereafter filed a supplemental petition with the District Court seeking to set aside the Commission's order of February 4, 1936. On February 23, 1937, the District Court set aside the order and

the Interstate Commerce Commission and the United States prosecuted an appeal therefrom to the United States Supreme Court, United States et al. v. Griffin et al., 303 U.S. 226, 58 S.Ct. 601, 82 L.Ed. 764.

The Supreme Court reversed the decree of the District Court on the ground that the district court lacked jurisdiction. The case had been heard in the District Court by three judges under the provisions of the Urgent Deficiencies Act of October 22, 1913, 38 Stat. 208, 28 U.S.C.A. § 41(28). The Supreme Court held (303 U.S. 226, 233, 58 S.Ct. 601,) that as respects the Interstate Commerce Commission, injunctive relief applied only to orders of such public importance and widespread effect as to justify the extraordinary features of the Urgent Deficiencies Act, and that there was not, in the case before them, such importance and effect. The Supreme Court concluded with the following language [303 U.S. 226, 58 S.Ct. 607]:

"Fourth. The absence in the Railway Mail Pay Act of a provision for judicial review and the denial of jurisdiction under the Urgent Deficiencies Act do not preclude every character of judicial review. If the Commission makes the appropriate finding of reasonable compensation but fails, because of an alleged error of law, to order payment of the full amount which the railroad believes is payable under the finding, the Court of Claims has jurisdiction of an action for the balance, as the claim asserted is one founded upon a law of Congress. Missouri Pacific R. Co. v. United States, 271 U.S. 603, 46 S.Ct. 598, 70 L.Ed. 1109. Compare United States v. New York Central R. Co., 279 U.S. 73, 49 S.Ct. 260, 73 L.Ed. 619, affirming 65 Ct.Cl. 115, 121.[1] And since railway mail service is compulsory, the Court of Claims would, under the general provisions of the Tucker Act, 24 Stat. 505, have jurisdiction also of an action

for additional compensation if an order is confiscatory. United States v. Great Falls Mfg. Co., 112 U.S. 645, 5 S.Ct. 306, 28 L.Ed. 846; North American Transportation & Trading Co. v. United States, 253 U.S. 330, 333, 40 S.Ct. 518, 64 L.Ed. 935; Jacobs v. United States, 290 U.S. 13, 16, 54 S.Ct. 26, 78 L.Ed. 142, 96 A.L.R. 1. Moreover, as district courts have jurisdiction of every suit at law or in equity 'arising under the postal laws,' 28 U.S.C. § 41(6), 28 U.S.C.A. § 41(6), suit would lie under their general jurisdiction if the Commission is alleged to have acted in excess of its authority, or otherwise illegally. Compare Powell v. United States, 300 U.S. 276, 288, 289, 57 S. Ct. 470, 81 L.Ed. 643. But a suit under the Urgent Deficiencies Act to set aside an order concerning mail pay is not primarily one against the Commission. Primarily, it is a suit against the United States.[2] And the United States can be sued only when authority so to do has been specifically conferred.

"The Railway Mail Pay Act does not confer that authority."

But this is not the first case where these dual or alternative grounds for jurisdiction were considered.

In New York Central Railroad Co. v. United States, 65 Ct.Cl. 115, affirmed on appeal, 279 U.S. 73, 49 S.Ct. 260, 73 L.Ed. 619, which was a suit for mail pay as fixed by the Interstate Commerce Commission from the date of filing of application with that commission for readjustment of compensation, this court took jurisdiction because the carrier was "asserting a claim founded upon a law of Congress." The Act of July 28, 1916, 39 Stat. 412, was involved as here. But with reference to the power and jurisdiction of the Commission this court said: Congress "erected a tribunal or accepted one already in existence to discharge a duty which was judicial in its na-

---

[1] Other decisions of the Court of Claims under the Railway Mail Pay Act of 1916 are: Chicago & E. I. Ry. Co. v. United States, 63 Ct.Cl. 585; Nevada County Narrow Gauge R. Co. v. United States, 65 Ct.Cl. 327; Chicago & E. I. Ry. Co. v. United States, 72 Ct.Cl. 407; Macon, D. & S. R. Co. v. United States, 78 Ct. Cl. 251, Id., 79 Ct.Cl. 298. Compare Pere Marquette Ry. Co. v. United States, 59 Ct.Cl. 538; New Jersey & N. Y. R. Co. v. United States, 80 Ct.Cl. 243.

[2] Compare Judicial Code, § 211, 36 Stat. 542, 1150, as amended, 38 Stat. 219, 28 U.S.C.A. § 48; Lambert Run Coal Co. v. Baltimore & Ohio R. Co., 258 U.S. 377, 382, 42 S.Ct. 349, 66 L.Ed. 671.

ture, the ascertainment of reasonable compensation to carriers for services exacted by statute," citing Monongahela Navigation Co. v. United States, 148 U.S. 312, 327, 13 S.Ct. 622, 37 L.Ed. 463, to the effect that when a taking has been ordered, then the question of compensation is judicial.

Following the decision in United States v. Griffin, supra, February 28, 1938, the plaintiffs herein filed their original petition February 2, 1942, and amended petition December 28, 1944.

The plaintiffs sue for the principal sum of $252,061.63 which they say represents the difference between the mail pay they received for the period April 1, 1931, to February 28, 1938, both dates included, and fair and reasonable compensation for the services rendered.

The defendant urges that the above-quoted statements of the Supreme Court are obiter. We do not think they are, but even so, what is said by way of obiter may nevertheless be good law.

■ A deficit in net railway operating income from the carrying of the mail is, on its face, confiscatory. That must be conceded. It is a simple proposition that needs no support and must be accepted as obvious. But, if we correctly read the decision of the Commission in the plaintiffs' case, reported in 192 I.C.C. 779, supra, the Commission's position is that the deficit of $4,-945 is a "computed" deficit, not necessarily an actual deficit, and therefore not to be taken as "confiscatory," although the Commission does not use that term.

■ The trouble with this argument is that a deficit in net railway operating income from mail is always necessarily "computed." *Actual* loss or *actual* deficit in such income is an ignis fatuus. This must be so until the method of arriving at a deficit receives authoritative if not common acceptation. The Postmaster General himself proposed three alternative plans which itself indicates lack of an absolute rule.

Senate Document No. 63, 78th Congress, 1st Session, entitled "Letter from the Chairman, Interstate Commerce Commission, transmitting in response to Senate Resolution No. 119, certain information on rail freight service costs in the various rate territories of the United States," states in the letter of transmittal, June 7, 1943, that the Commission had not yet had opportunity to pass judgment upon the cost figures contained in the study.

At a hearing on this case by a commissioner of this court February 18, 1946, a witness for the defendant, the Chief of Section, Cost Section of the Bureau of Transport Economics and Statistics, who was acknowledged in Senate Document No. 63 as especially contributing in the preparation of the cost study, stated, in response to a direct question as to whether the present cost formulae were much better than the cost formulae used by the Commission in 1928 or in 1931:

"Well, in 1928 and 1931 the Commission did not have really any cost formulae. They still haven't got any cost formulae, but the Cost Section was formulated for the express purpose of determining cost formulae for that they might be used by the Commission in gathering costs and might be distributed to the carriers so they would have means and procedures for gathering those costs.  *  *  *"

We thus see that ascertainment of "actual" as applied to plaintiffs' cost in the transportation of the mail, had no prospect of realization. The cost had to be a "computed" cost in any event. But had we the actual cost it would serve only as a guide, a cost to be considered, but not necessarily to govern, in arriving at fair and reasonable compensation. The question is, rather: What is the fair and reasonable cost? For we cannot proceed from an unfair and an unreasonable cost toward a fair and reasonable compensation.

Here, however, it is found that "there is no evidence which indicates that plaintiffs' operating costs were excessive in relation to the character of the road and the traffic area, or that such costs were increased by inefficiency, negligence, or uneconomical management or operation by the plaintiffs."

Nowhere in the Commission's findings or conclusions in plaintiffs' case do we find even an intimation that the so-called "actual" cost, whatever it might be, was anything but fair and reasonable. What we do find is that, on the facts as found and stated by

the Commission, there is an erroneous conclusion of law by the Commission that plaintiffs have been fairly and reasonably compensated for their mail service. Cf. Case et al. v. Los Angeles Lumber Products Co., Ltd., 308 U.S. 106, 114-120, 60 S.Ct. 1, 84 L.Ed. 110.

The so-called "computed" cost being the only cost that can be used, it must be fairly and reasonably computed. To what extent it approaches a fair and reasonable cost not in excess of actual cost is a matter not yet within the ability of the Commission to determine. It is a question that must be answered by good judgment, by those peculiarly fitted and equipped to ascertain the requisite facts as to such cost and exercise that judgment. Congress has chosen the Interstate Commerce Commission to perform that function, and it has done so.

■ As the Supreme Court has said, this Court has jurisdiction to render judgment of recovery for an amount sufficient to constitute fair and reasonable compensation under the facts as found by the Commission, unpaid through failure of the Commission, because of an error of law, to order payment thereof.

Under finding 16 herein, it is shown that the Interstate Commerce Commission found and determined that plaintiff would require an increase in its mail revenue of 87.4% in order to secure for itself, under Plan 2 adopted by the Commission, a return of 5.75% theretofore fixed by the Commission, on its investments in road and equipment engaged in mail traffic. This determination was based on the calendar year 1931 test period. The Commission's findings were determined upon an apportionment of passenger equipment used for mail traffic on the basis of space hired or required for carrying the mail.

Railroad expenses are not generally applicable as direct costs but require apportionments. The Commission did not, under Plan 2, which it adopted and which we must accept, determine actual costs of various operations. For the year 1931 the total operating costs of plaintiffs' road were found to be $1,449,801. Of this sum 21.74%, or $315,273, was determined to be apportioned to passenger train service in which the mail traffic was served. Based upon the space used or hired, the Commission determined total expenditures applicable to the mail service of $40,673. As against these expenditures, the plaintiffs' road had a deficit in this test period of $4,945, which indicates that its gross mail revenues were $35,728. In other words, the mail revenues were $4,945 less than the operating expenditures applicable to the mail service, which resulted in such deficit.

The Commission then determined that of the total investments in the road (rails and bed), 21.44% was apportioned to the passenger train service with a value of $3,401,578. On the basis of mail space used or hired by the United States, the passenger train road investment of $438,803 was applicable to the mail traffic.

In addition to the road investments, the Commission found that approximately 10% of the total investments in equipment was applicable to the passenger train service amounting to $135,257; and that the mail traffic required $18,279 of the investment in this passenger train equipment.

By adding the road investment of $438,803 and the equipment investment of $18,279 applicable to the mail traffic, it was determined that the total investment by the carrier in road and equipment devoted to the mail service was $457,082.

At a return of 5.75% on the total investments apportioned for mail traffic of $457,082, it was found that a net income of $26,282 for carrying the mails would be required for the test period 1931. Since the carrier operated at a deficit of $4,945 for mail traffic in 1931, this deficit would have to be taken care of in an increased allowance of $31,227 to result in a net income of $26,282 (finding 16).

The required increase of $31,227 in mail revenue is, as found by the Commission, 87.4% of the actual gross mail revenue received during 1931 ($31,227÷$35,728= 87.4%).

The table in finding 23 herein shows first, the mail revenue received by years or fractions of years covered by the period involved herein and, second, the increase required at 87.4% of such gross revenues received to overcome and avoid the deficit.

These increases for the years involved, under the findings of the Commission, total $186,707.06.

The commissioner to whom this case was referred for the taking of testimony and the making of a report thereon has in his report included certain findings which, in the final analysis, do not directly determine the outcome of this suit, but we have retained and adopted them in our special findings of fact because they give background and illustrate the problem that was, and, for that matter, apparently still is before the Interstate Commerce Commission. They demonstrate, we think, one reason at least that Congress confided to the Commission the judicial task of determining fair and reasonable compensation. The use of the space basis system for paying transportation required consideration of the question in what proportion, if any, baggage, freight, express, passenger, mail service should pay for space unused, in fact what should constitute unused space. There is in the record some distinction made between "unused" and "unoccupied" space. The quantities of baggage, express, and mail inevitably varied, and for practical reasons the space available would have to be ordinarily more than that physically taken by the cargo. Conceivably, also, there had to be space for handling of the cargo. Students of cost allocations or apportionments were not altogether sure as to their methods. The "out-of-pocket" or "added" cost theory has been injected into the case (findings 31-33), but we are not convinced that additional service is in any different situation than the service to which it is an addition, as far as computing fair and reasonable compensation is here concerned. We think there is just as good reason for considering express as the added service rather than the mail. The fact that a carrier is only too glad, perhaps anxious, to carry mail to help cover otherwise wasted floor space, is understandable. But that is no reason why the mail should be carried at "bargain" rates. A passenger who goes aboard a train after the coach has already accumulated a paying load, must nevertheless, and rightly so, pay full fare, along with all the rest. Cf. Fred R. Comb Co. v. United States, 103 Ct.Cl. 174, 183. We do not say that the added cost

or out-of-pocket theory, with its implications, is inapplicable in all cases. But the theory, if we are to believe the witnesses, has not matured into practice in the determination of mail pay.

In view of the record presented the basis employed by the Interstate Commerce Commission, that is to say Plan No. 2, appears to be fair and reasonable. The studies made are in no wise shown to be out of line with the then state of the art, science, or profession of statistical analyses and cost accounting.

The deficit found in plaintiffs' mail operations was ascertained according to the formula suggested by the Government and used by the Commission to prescribe rates for general application. As we have pointed out, the ascertainment of fair and reasonable compensation must proceed from a fair and reasonable basis. The Commission has, by its use of Plan No. 2, adjudged it to be a fair and reasonable basis. And out of that basis there has been ascertained, by formulae prescribed by the Commission, what is the fair and reasonable compensation for plaintiffs' carriage of the mails beginning the first of April 1931, and ending at the close of February 1938. Fair and reasonable compensation cannot be both a deficit and the amount of $186,707.06 so found. It is, we conclude, the latter.

The Commission's decision of May 10, 1933, 192 I.C.C. 779, states its position with reference to plaintiffs' claim as follows:

"The cost study is not considered to be an accurate ascertainment of the actual cost of service. It is an approximation to be given such weight as seems proper in view of all the circumstances. See Railway Mail Pay, supra. The comparison of mail revenue with other revenue received for services in passenger-train operations shows that mail with relation to the other services is bearing its fair share of the expenses of operation and is contributing relatively more than the other services for the space furnished. Applicant receives the same rates as those received by other roads for the same kind of service. Many of these other roads are, as applicant points out, roads which are very much larger and which have greater traffic and lower unit

operating costs. On the other hand many are in much the same situation as the applicant in respect of passenger-train operations. The data submitted fail to justify giving the applicant rates higher than those now paid other railway common carriers for like service."

We quote rather than paraphrase this, for what it says is important. We are of the opinion that the "approximation" should be given greater weight than the Commission affords it, because, as we have said, and the Commission in effect admits, there is no such thing as certainty in actual cost. Approximate, or as it is called, "computed" cost must be relied upon, and as a matter of law must be decisive. There is no alternative, at least no satisfying alternative. Of course there were other methods of computing cost, but the Commission, put to the choice, selected Plan No. 2. And it did not, in the decision of May 10, 1933, abandon Plan No. 2 and select another.

█ The fact that the plaintiffs' railroad "receives the same rates as those received by other roads for the same kind of service," is not responsive to the plea that those rates, as to the plaintiffs, are confiscatory. The service is compulsory, economy and efficiency of operation are undisputed. This is not a case where the carrier may cut down its expenses and thus convert the remuneration into one that is fair and reasonable. It has already reached the efficient and economical stage, and if it must carry the mail, the remuneration must fit that situation. Here it has not done so.

We cannot agree that the basis of compensation is to be governed by the added or out-of-pocket cost theory. It was not applied in Plan No. 2, as that plan is explained to us, and we cannot find that plan grossly erroneous. The plan applied to a group gave certain rates, but the rates good for the group did not fit plaintiffs' road. The plan applied to the plaintiffs' road gave higher rates than to the average road and are the only rates presented in the Commission's decisions that give the plaintiffs fair and reasonable compensation. The plaintiffs here are entitled to them. The average road has no physical existence and the general rates put into particular effect would mean greater or less compensation for the individual carrier. But the governing statute was careful to make provision whereby the rates might not be confiscatory for any one road.

The plaintiffs were not in a bargaining position. It was unlawful for them to refuse "to perform mail service at the rates or methods of compensation provided by law," etc. 39 U.S.C.A. § 563. The duty of the Commission extended beyond that of establishing *rates*. The statute went further and required the Commission to fix fair and reasonable *compensation* to the individual carrier. It had to be the *individual* carrier, for otherwise the term "compensation" is meaningless. Only in the event that they were "just and equitable," could the Commission "fix general rates applicable to all carriers in the same classification." 39 Stat. 412, 430, 39 U.S.C.A. § 549. Rates are not just and equitable that give one carrier a net revenue and impose upon another carrier, in the same class, a deficit.

The rates authorized by the Commission were based on a grouping together and then given particular application without change. It did not follow that rates, fair and reasonable for an average road (which in fact did not exist), would be fair and reasonable for all existing roads. The statute required more than mere rates, it required fair and reasonable compensation, and the duty of fixing upon and authorizing payment of fair and reasonable compensation in any particular case could not be avoided because of the magnitude of the task, or because some other methods of calculation, which, although neither approved nor adopted, might possibly give other results.

There is no presumption that the average is true of the particular. The presumption is otherwise, and the plaintiffs, having shown their railroad to be in a comparatively low scale, and thus distant from the average, had no great burden of proof before them in presenting their case to the Commission. It was for the Commission to demonstrate that the general rates prescribed gave the plaintiffs a fair and reasonable return. This the Commission failed to do. More than that, the Commission has by its findings, using its adopted plan and

its own methods as applied to plaintiffs' circumstances, proved that plaintiffs have been underpaid $186,707.06 in fair and reasonable compensation for the period in question. See Finding No. 23.

If that which the Commission determined is fair and reasonable compensation for the representative road, it must, we think, be fair and reasonable for any one road that is so represented. The reasons given by the Commission for not ordering payment, on the basis of its findings, of the annual sums making up the above total of $186,707.06, are not convincing or even persuasive. In our opinion they all overlook the statutory mandate that the compensation to be allowed for carrying the mails must be reasonable, and the constitutional one that it must be just.

■ There is the question as to the statute of limitation, Section 156 of the Judicial Code, U.S.C.A., Title 28, § 262. Under that statute, a claim is barred unless the petition is filed "within six years after the claim first accrues." The time when the claim can be definitely ascertained and set up governs. Ylagan v. United States, 101 Ct.Cl. 294, 296.

■ Since the determination of fair and reasonable compensation was confided by Congress to the Interstate Commerce Commission, the amount of the claim was not ascertainable until the Commission had given its final determination. This date was February 4, 1936, 214 I.C.C. 66. It is true that the Commission reopened its docket No. 9200 under the decree of a district court, which was thereafter held by the Supreme Court to be without jurisdiction over the complaint, but the Commission did in fact reopen the case, considered it on the merits, and did in fact thereupon render its final decision in the matter, affirming its previous holding.

The six-year statute of limitation therefore began to run February 4, 1936. Since the original petition was filed herein February 2, 1942, the claim is within the statute. That the claim relates back to the filing of the application with the Commission has been held by the Commission, by this Court, and by the Supreme Court, Railway Mail Pay, 144 I.C.C. 675, 717, and New York Central Railroad Co. v. United States, 65 Ct.Cl. 115, 124ff, a decision which antedated that of the Commission, and which was affirmed by the Supreme Court, 279 U.S. 73, 49 S.Ct. 260, 73 L.Ed. 619.

■ The final question relates to plaintiffs' claim for the allowance of interest on the principal sum recoverable, not as interest but as a part of, and to make just compensation complete and entire. It is true that the basic Act of Congress makes use of the terms fair and reasonable compensation, just and equitable. But in United States v. Thayer-West Point Hotel Co., 329 U.S. 585, 67 S.Ct. 398, the Court refused to assign a technical and absolute meaning to the term "just compensation," and this court, in the New York Central case, supra, which involved, as here, "fair and reasonable compensation" for compulsory carriage of the mails, stated: "We do not think the plaintiff can have judgment for interest on the deferred payments. We are not determining just compensation but are giving effect to an authorized order of the Interstate Commerce Commission. In such case the statute forbids the allowance of interest. Sec. 177, Judicial Code, as amended [28 U.S.C.A. § 284]. Cases cited in Liggett & Myers Co. case, (Liggett & Myers Tobacco Co. v. United States) 61 Ct.Cl. 693, 704."

Here, also, we are giving effect to an order of the Interstate Commerce Commission as properly construed and not determining compensation in an original proceeding under the Fifth Amendment.

Plaintiffs are entitled to judgment in the sum of $186,707.06, and it is accordingly so ordered.