**320**

**LOUISIANA & ARKANSAS RAILWAY COMPANY**

v.

**MISSOURI PACIFIC RAILROAD COMPANY, the Texas & Pacific Railway Company, and Greater Baton Rouge Port Commission.**

Civ. A. No. 67-139.

United States District Court
E. D. Louisiana,
Baton Rouge Division.

Aug. 7, 1968.

Arthur R. Carmody, Jr., Wilkinson, Woods, Carmody, Meadows & Hall, Shreveport, La., Robert W. Spachman, Kansas City, Mo., for plaintiff, Louisiana & A. Ry. Co.

Charles W. Chapman, St. Louis, Mo., for defendant, Missouri Pac. Ry. Co.

Murray Hudson, Hudson, Potts & Bernstein, Monroe, La., for defendant, Texas & P. Ry. Co.

George Mathews, Baton Rouge, La., for defendant, Greater Baton Rouge Port Commission.

WEST, Chief Judge:

Plaintiff, Louisiana & Arkansas Railway Company (L & A), brings this suit

seeking injunctive relief against defendants, Missouri Pacific Railroad Company (MoPac), Texas & Pacific Railway Company (T & P), and the Greater Baton Rouge Port Commission (Port Commission), in connection with the use, operation, and maintenance of certain rail facilities located within the port area at the Port of Baton Rouge, Louisiana. The Port Commission is an executive department of the State of Louisiana, and it operates public port facilities on the Mississippi River in four parishes of the State, including the facility in West Baton Rouge Parish known as the "West Bank" facility, which is here involved.

The West Bank facility is served by rail trackage owned entirely by the Port Commission and located entirely on property owned or leased by the Commission in the Parish of West Baton Rouge, Louisiana. This facility is a general cargo port composed of docking and mooring facilities, warehouses, bulk storage facilities, scrap metal storage facilities, transit sheds, and a large grain elevator. The rail operations to and from this port area involve the movement of some 18,000 rail cars annually, the great majority of which are unloaded in the port area. The area is serviced by rail by the plaintiff and the two defendant railroads. Pursuant to authority granted by the Louisiana Legislature, the Commission constructed, owns, and in the past maintained certain rail facilities used for the purpose of providing rail transportation to, from and within its port facility, including a lead track some six miles in length extending from the westerly railroad approach track to the Mississippi River Bridge to the West Bank port facility, together with the necessary connecting and interchange tracks and trackage within the port facility. The total trackage involved aggregates approximately 17 miles in length.

On December 31, 1956, an operating agreement was entered into between the three railroads here involved and the Port Commission pursuant to which, among other things, the railroads each agreed to perform all necessary switching services to, from, and within the port facility on a rotating yearly basis, i.e., each railroad to perform these services for one year at a time in accordance with tariffs to be published by the Interstate Commerce Commission. Under the agreement the Port Commission was obligated to maintain, repair, and keep in good serviceable condition all of the trackage and appurtenances thereof.

Article VII, Section 3, provides for the termination of the agreement as follows:

"Section 3. This agreement shall be and remain in full force and effect for a period of twelve (12) years from and after its effective date and thereafter until terminated upon the expiration of one (1) year following service by any party hereto on the other parties of written notice of its intention to so terminate the agreement."

These railroads operated under this agreement from July 5, 1955, which was, according to its terms, the effective date of the agreement, until July 5, 1967. The tariff provisions relating to this agreement are published as Item 110 of the Texas-Louisiana Freight Bureau Switching Tariff, I.C.C. No. 1043, and provides as follows:

"(d) The switching service to and from the West Bank facilities of the Greater Baton Rouge Port Commission is performed on a rotation basis by the lines parties to this Tariff as follows:

"July 5, 1966 to July 4, 1967 * * T & P Railway.
"July 5, 1967 to July 4, 1968 * * MoPac.
"July 5, 1968 to July 4, 1969 * * KCS–L & A Railway.

"During the period when any of these lines is actually performing the switching service, absorption of the switching charges of the operating line as published herein will be made to the extent provided in the individual terminal tariffs of such lines."

After a long history of difficulties in maintaining and repairing the tracks and appurtenances thereto, the Port Commission began searching for a suitable alternative to performing these services itself. It discussed these problems with all three railroads involved in this suit, and invited each of them to offer suggestions as to how these services could be better performed. After receiving little or no response, the Port Commission, in accordance with Article VII, Section 3 of the agreement, notified all three railroads on or about June 28, 1966, of its intention to terminate the operating agreement as of July 5, 1967. The Port Commission then entered into an agreement with the defendant, T & P, whereby the T & P would, after July 5, 1967, perform all switching services to, from, and within the Port on a permanent basis, and would also undertake to maintain and repair all of the rail facilities and appurtenances thereto belonging to the Port Commission. There was no change in the switching charges, switching absorptions, line-haul rates, or line-haul routes. All three railroads still hold themselves out to shippers as handlers of traffic to and from the Port facilities. Plaintiff, L & A, strenuously contends that such an agreement between the Port Commission and the T & P results in the T & P performing rail operations contrary to the published tariff, and in violation of Section 6 of the Interstate Commerce Act, 49 U.S.C.A. § 6. It also contends that the agreement has forced the MoPac and the plaintiff, L & A, to cease performing rail operations as required by the operating agreement without having first secured a certificate from the Interstate Commerce Commission as required by Section 1 (18) of the Interstate Commerce Act, 49 U.S.C.A. § 1 (18). Plaintiff further argues that the T & P is about to remove a portion of the Port Commission's lead track, and that to do so will force plaintiff, L & A, to "abandon operation of all or a portion of a line of railroad without there having been obtained from the I.C.C. a certificate" authorizing them to do so, all in violation of Section 1 (18) of the Interstate Commerce Act, 49 U.S.C.A. § 1 (18). Plaintiff, by this suit, seeks an injunction enjoining the defendant from operating under the new agreement between the Port Commission and the T & P Railroad, and ordering the defendant to continue operating in accordance with the operating agreement of December 31, 1956, and the subsequently published tariff, I.C.C. No. 1043. After careful study of the voluminous briefs and other data filed herein, it is the opinion of this Court that the plaintiff is not entitled to the relief which it seeks.

This case boils down to the narrow question of whether or not the trackage in question constitutes a "line of railroad" as contemplated by Section 1 (18) of the Interstate Commerce Act, or whether instead it is "spur, industrial, team, switching, or side tracks" as contemplated by the exception contained in said Section 1 (18).

Section 1 (18) of the Interstate Commerce Act reads as follows:

"No carrier by railroad subject to this chapter shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this chapter over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line of railroad, and no carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment. Nothing in

this paragraph or in section 5 of this title shall be considered to prohibit the making of contracts between carriers by railroad subject to this chapter without the approval of the Commission, for the joint ownership or joint use of spur, industrial, team, switching, or side tracks."

Whether or not the trackage falls within the "line of railroad" category contained in Section 1 (18) or in the excepted category of "spur, industrial, team, switching, or side track" category contained therein, is for the Court, rather than the Interstate Commerce Commission, to decide. 49 U.S.C.A. § 1 (20); Powell v. United States, 300 U.S. 276, 57 S.Ct. 470, 81 L.Ed. 643 (1937). This was also recognized by the Interstate Commerce Commission in this very matter when the plaintiff, contemporaneously with filing this suit, instituted proceedings before the Interstate Commerce Commission protesting the abandonment of the operating agreement here involved. In Switching and Routing, West Bank Port Facilities at Baton Rouge, I & S Docket No. 8371, 332 I.C. C. 398, the Commission found that it was without jurisdiction over this matter when it declared:

"If the cancellation of the instant tariff item has the effect of constituting an unlawful abandonment, the protestant's sole remedy is an action under Section 1 (20) of the Act. That section provides the only method of enforcing the provisions of section 1 (18). It states that any abandonment contrary to the provisions of section 1 (18) may be enjoined at the suit of the United States, this Commission, or any commission or regulating body of an affected State, or any party in interest. By protest against the instant tariff, the L & A is seeking an order of the Commission equivalent to a decree of a court in a suit under Section 1 (20) to enjoin an abandonment, and the remedy provided by that Section is clearly inconsistent with a proceeding before the Commission to attain the same end. The statutes cannot be construed as affording a party seeking to enforce Section 1 (18) a choice of forums or remedies."

Turning to the question, then, of whether or not the trackage in question constitutes a "line of railroad," this Court has no difficulty in concluding that it does not. Specifically exempted from the operation of Section 1 (18) and Section 1 (20) is the construction or abandonment of spurs, industrial, team, switching, or side tracks located or to be located wholly within one state. 49 U. S.C.A. § 1 (22). The trackage involved in this suit is non-carrier owned and has been, for the past twelve years, non-carrier maintained. The rails are of light weight stock and are all located within one parish of the state. There has never been any station, facilities for handling less than carload freight, signaling systems, telephone or telegraph communications systems, or railroad agents located on or along any of the trackage involved. No passenger trains or line-haul freight trains have ever operated over the trackage. Each carrier's right to use the trackage has been limited for the past twelve years by contract to the performance of switching services every third year. The trackage has never been used for any purpose other than switching. It has been used primarily to service only one industry, Cargill, Incorporated. It is obvious from these facts alone that by no stretch of the imagination could this trackage be considered to be a "line of railroad." It is spur and switching trackage purely and simply and as such not subject to the control of the Interstate Commerce Commission under Section 1 (18)–Section 1 (22) of the Interstate Commerce Act. United States v. State of Idaho, 298 U.S. 105, 56 S.Ct. 690, 80 L.Ed. 1070 (1936); New Orleans Terminal Company v. Spencer, 366 F.2d 160 (CA 5–1966); Chicago, Milwaukee, St. P. & P. R. Co. v. Chicago & E. I. R. Co., 198 F.2d 8 (CA 7–1952); New York Central R. Co. v. Chicago & Eastern Ill. R. Co., 222 F.2d 828 (CA 7–1955); Detroit & Toledo Shore L. R. Co. v. New York Cen-

tral R. Co., 233 F.2d 168 (CA 6–1956). While in the New Orleans Terminal Company case, supra, the Court found the trackage involved to be a "line of railroad" it also found that:

"If, however, the trackage is used in the loading, reloading, storage and switching of cars incidental to the receipt of shipments by the carrier or their delivery to the consignee, then such trackage is 'spur, industrial, team, switching or side tracks' and as such, not under Commission jurisdiction." 366 F.2d at page 166.

Thus the present case falls within the purview of that observation found in the New Orleans Terminal Company case. The trackage in that case was utilized in the through movement of freight, while the trackage here involved is used for nothing other than the "loading, reloading, storage and switching" of cars as an incident to the receipt and delivery of shipments to and from the carriers. The rail facilities in the Baton Rouge Port area are terminal facilities. Shipments terminate here. No trains are made up here and no through trains travel over this trackage.

As stated by the Interstate Commerce Commission in the opinion which they rendered in connection with this very same dispute, Switching and Routing, West Bank Port Facilities at Baton Rouge, supra:

"As mentioned above, routing via the L & A in direct service to the Port Commission's facilities is still open. That carrier holds itself out to the public to perform such service and is obligated to do so. It also, by tariff provision, absorbs the switching charges when it does not perform the switching service. In view of these considerations, it is difficult to understand how the L & A is being forced into an unlawful abandonment. The Port Commission has cancelled the former arrangement, but that is a matter of private contract between the parties." 332 I.C.C. at page 402.

Plaintiff cites many cases in support of its position, but a careful study of each of them discloses that they are easily distinguishable from the present situation. In each of the cases cited by the plaintiff the Court found, under the facts of the particular case, that a "line of railroad" was involved, and that changes in or abandonment of the particular trackage involved was a subject of national concern rather than a matter of local concern properly governed by private contract between the parties. Under the specific facts of this case, this Court, after taking into consideration the fact that the provisions of the Interstate Commerce Act should be given a liberal interpretation and that exemptions from its sweep should be narrowed and limited, Piedmont & Northern Ry. Co. v. Interstate Commerce Commission, 286 U.S. 299, 52 S.Ct. 541, 76 L.Ed. 1115 (1932); Chicago, Milwaukee, St. P. & P. R. C. v. Northern Pac. R. Co., 120 F.Supp. 710 (W.D. Wash.–1954), has no difficulty in finding that the trackage involved is not a "line of railroad" but is solely and entirely spur and/or switching trackage not subject to control by the Interstate Commerce Commission. It is trackage specifically exempt under the provisions of Section 1 (18) and Section 1 (22) of the Interstate Commerce Act and is thus trackage which is a proper subject of contract between the various carriers by railroad and the Port Commission insofar as the maintenance and use of the facilities is concerned. The operating agreement of December 31, 1956 was properly terminated by the Port Commission in strict accordance with the termination provisions contained therein. A new agreement was entered into between the Port Commission and the T & P Railroad. Neither the plaintiff, L & A, nor the MoPac have any legal ground for complaint. Plaintiff's demands for injunctive relief will thus be denied, and this suit accordingly dismissed at plaintiff's cost.