**INTERSTATE COMMERCE COMMISSION, Plaintiff,**
**and**
**Alco-Gravure, Inc., Plaintiff-Intervenor,**

**v.**

**The BALTIMORE AND ANNAPOLIS RAILROAD COMPANY and Elmer J. Jubb, Defendants.**

**Civ. No. B-74-786.**

United States District Court,
D. Maryland.

Aug. 26, 1974.

Earl H. Nemser, Cadwalader, Wickersham & Taft, New York City, and Francis J. Gorman, Semmes, Bowen & Semmes, Baltimore, Md., for plaintiff-intervenor.

Joseph I. Huesman, Baltimore, Md., for defendants.

BLAIR, District Judge.

The Interstate Commerce Commission (ICC) instituted this civil action on July 25, 1974, seeking preliminary and permanent injunctive relief against the defendants, the Baltimore and Annapolis Railroad Company (B & A) and its president, Elmer J. Jubb. Specifically, the ICC seeks to restrain the B & A from its alleged illegal abandonment of a segment of its track that runs from Clifford Junction in Baltimore City, where it connects with tracks of the Chesapeake and Ohio and Baltimore and Ohio Railroads (C & O–B & O), to a point approximately six miles south of that connection.[1] Shortly after the suit was filed, a former customer of the railroad, Alco-Gravure, Inc. (Alco), sought to intervene in the action pursuant to Rule 24(b) of the Federal Rules of Civil Procedure. On the eve of the hearing on the motion for preliminary injunction, the defendants moved to dismiss or, in the alternative, to stay the proceedings pending the outcome of an application now before the ICC in which the railroad seeks permission to abandon service permanently along its entire route. The court limited the hearing solely to the motion for preliminary injunction and the motion to intervene.[2] The action arises under Section 1(18), (19) and (20) of the Interstate Commerce Act, 49 U.S.C. §§ 1(18), (19), (20), and juris-

Daniel S. Linhardt, Bureau of Enforcement, Interstate Commerce Commission, Washington, D. C., and Leonard M. Linton, Jr., Asst. U. S. Atty., D.Md., for plaintiff.

1. In its original complaint the ICC sought to enjoin the abandonment of the entire 21.5 miles of track from Clifford Junction to Annapolis, Maryland that the railroad had operated until 1968. At the hearing on the plaintiff's motion for a preliminary injunction, however, the ICC moved orally to. amend its complaint, limiting relief sought in both the temporary and permanent injunctions to the six mile segment that will be described at greater length *post*.

2. It should be noted that Alco, which seeks to intervene, has chosen not to seek a preliminary injunction in its own right.

diction is properly grounded on 28 U.S. C. §§ 1337, 1345 and 49 U.S.C. § 1(20).

The Baltimore and Annapolis Railroad, a common carrier by railroad within the meaning of Section 1(1) of the Act, 49 U.S.C. § 1(1), initiated freight and passenger service between Baltimore and Annapolis in the 19th Century. The present corporation was established in 1935. Prior to 1950, it operated as an inter-urban electric railroad. In 1938, B & A commenced bus service between Baltimore and Annapolis, and in 1950 it eliminated all passenger rail service. At that time it also eliminated its electric rail cars and purchased a used Diesel locomotive to continue its rail freight service, which today constitutes the B & A's sole rolling stock. The Maryland Metropolitan Transit Authority has recently acquired its buses used for regular service; it continues to operate a charter bus service.

B & A furnished rail freight service to Annapolis until 1968, at which time the timber trestle bridge across the Severn River, immediately north of the city, was found to be unsafe. Subsequently, in 1969 a wash-out at Marley Creek, approximately seven miles south of the railroad's junction with the C & O–B & O's right-of-way, resulted in the discontinuance of service over the approximately 12.5-mile segment from Glen Burnie, Maryland to the north bank of the Severn River.

In June 1972, Hurricane Agnes severely damaged the Patapsco River Bridge, which lies on the B & A's right-of-way approximately eight-tenths of a mile south of Clifford Junction. In addition, the floods that accompanied Agnes washed out several sections of the track. As a result of this damage, B & A was unable to continue service to Alco's plant and it issued an embargo on all traffic. To date, no repairs have been undertaken on the track damaged by tropical storm Agnes, and service has not been restored south of the Patapsco River.

Upon discontinuation of service, B & A and Alco had several meetings to discuss various means of restoring service. B & A made a written proposal that Alco advance approximately $50,000 to be applied to repairs and recover the advance out of shipping charges at the rate of $15 per freight car shipment. This proposal was not acceptable to Alco and the negotiations never reached fruition. On September 26, 1972, Alco without notice to B & A and during these negotiations filed its formal complaint before the ICC, seeking to have the B & A restrained from alleged violations of Sections 1(4), 1(11) and 1(18) of the Act, 49 U.S.C. §§ 1(4), 1(11) and 1(18), and damages for their violations. Alco is in the business of rotogravure printing and maintains a printing plant having a value in excess of $10,000,000 near Glen Burnie, Maryland. Until the suspension of service following the damage wrought by Agnes, Alco received approximately 80 percent of the newsprint paper used in its operations directly at its plant over the B & A's rail line. Its plant was designed in reliance on rail service, and the flow-through operation originally envisaged cannot be efficiently employed with the present system of supplying the paper by truck. As a result of discontinued rail service, Alco claims that it has suffered and will continue to suffer significantly greater expense in its operation, and that major redesign of its plant will be necessitated if it is forced to rely on trucks for the supply of newsprint. In addition, as a result of its forced reliance on trucking, it has had to rent warehouse space to store the newsprint after its arrival in Baltimore by train. Previously, the railroad cars had provided the storage space necessary. To date, Alco has incurred additional costs of approximately $218,000 as a consequence of the loss of B & A's rail service. Alco's warehouse lease expires on or about January 1, 1975, and it must agree to a renewal of the lease within the next thirty days. For this reason

it urges the court to promptly grant ICC's application for a preliminary injunction.

After Alco had filed its complaint with the ICC the B & A filed an application in January 1973 for a certificate of public convenience and necessity permitting abandonment of its operations over its entire line. Alco's complaint proceeding was then consolidated for hearing with the hearing on the B & A's abandonment application. The abandonment application was scheduled to be heard on July 10, 1973. On July 5, 1973 B & A was notified that the hearing was postponed indefinitely. The ICC's action in postponing the hearing was an administrative determination following a decision of the United States District Court for the Southern District of New York which required the ICC to conduct an environmental impact study in appropriate cases before acting in abandonment proceedings. Harlem Valley Transp. Ass'n v. Stafford, 360 F.Supp. 1057 (S.D.N.Y.1973), aff'd, 500 F.2d 328 (2d Cir. 1974). In effect the ICC stayed all abandonment proceedings because of the *Harlem Valley* decision.

As a result of this stay, Alco moved to sever its complaint proceedings from the B & A's abandonment application, and this motion was granted. After the hearing before an Administrative Law Judge in November 1973, an Initial Decision and Order was issued. The Administrative Law Judge found that through the issuance of a temporary embargo, the B & A unlawfully abandoned all operations over its line in violation of Sections 1(4) and 1(18) of the Act. The B & A was ordered to cancel its temporary embargo and take the necessary steps to restore rail service to Alco. Further, the matter was referred to the ICC Bureau of Enforcement to institute a judicial proceeding to require the B & A to restore rail service to Alco.

Both Alco and the B & A filed certain exceptions to the Judge's Initial Decision, which stayed its effect. Alco thereafter petitioned the ICC to expedite decision on the exceptions taken to the Administrative Law Judge's Initial Decision, and the B & A cross-petitioned and prayed that such decision await the outcome of the abandonment proceeding. No decision has been made on these petitions, and B & A's petition for abandonment, now pending for nineteen months, has not yet been heard.

■■■ Alco moves to intervene in this action, for permanent injunctive relief only, pursuant to Rule 24(b) of the Federal Rules of Civil Procedure. In pertinent part the rule provides that "anyone may be permitted to intervene in an action . . . when an applicant's claim or defense and the main action have a question of law or fact in common." The granting of such a motion is discretionary, the court considering "whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." Fed.R.Civ.P. 24(b). It appears that Alco could bring a separate action for injunctive relief, as a "party in interest" under 49 U.S.C. § 1(20) (1970). *See* Myers v. Arkansas & O. Ry. Corp., 185 F.Supp. 36, 40 (W.D.Ark.1960) (shipper held to be a "party in interest"). Common questions of law and fact are involved. Intervention will not delay or prejudice the adjudication of the rights of the other parties. Alco's motion will be granted.

Sections 1(18) and 1(20) of the Interstate Commerce Act, 49 U.S.C. § 1(18), (20) (1970), provide the basis for this suit. Section 1(18) states, in relevant part:

. . . [N]o carrier by railroad subject to this part shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment.

Section 1(20) further provides:

> . . . Any . . . abandonment contrary to the provisions of this paragraph 'or of paragraph (18) or (19) of this section may be enjoined by any court of competent jurisdiction at the suit of . . . the Commission.

■ The ICC is authorized to institute suits under section 1(20) without prior resort to ICC administrative hearings. ICC v. Chicago, Rock Island & Pac. R.R., 501 F.2d 908, at 912 (8th Cir. 1974); see Powell v. United States, 300 U.S. 276, 287, 57 S.Ct. 470, 81 L.Ed. 643 (1937). See also Meyers v. Jay Street Connecting R.R., 259 F.2d 532 (2d Cir. 1958); Myers v. Arkansas & O. Ry. Corp., 185 F.Supp. 36 (W.D.Ark.1960). While the defendant has filed a petition for a certificate of abandonment, the issue in a proceeding for a permanent injunction under Sections 1(18) and 1(20) of the Act is not whether the abandonment shall be granted or denied—for that is for the Commission to decide in the railroad's pending abandonment proceeding subject to judicial review—nor whether there is a probability that the Commission will grant or deny defendant's request for abandonment. Rather the question is whether an "abandonment" has occurred within the meaning of 49 U.S.C. § 1(18), ICC v. Chicago, Rock Island & Pac. R.R., supra, 501 F.2d at 913, and whether the court should grant equitable relief. If there has been an abandonment, then the court, in its discretion, may issue an injunction restraining such abandonment. Unless and until the Commission grants the certificate permitting a carrier to abandon all or part of its railroad, no abandonment of operations is permitted by the Act. 49 U.S.C. § 1(18) (1970).

■■ Of course, in considering a request for a *preliminary* injunction, the legal issues are somewhat different, since the purpose of a preliminary injunction is generally to maintain the status quo until a trial may be had on the merits. 7 Moore's Federal Practice ¶ 65.04 [1] (2d ed. 1974). Further, this action is in the nature of a *mandatory* preliminary injunction—requiring the defendant railroad to spend substantial sums to resume service over its line. While the court has power to issue a mandatory preliminary injunction, such power will not be exercised lightly. *Id.*

■ It is well established that the issuance or denial of a preliminary injunction lies within the sound discretion of the court. West Virginia Highlands Conservancy v. Island Creek Coal Co., 441 F.2d 232, 235 (4th Cir. 1971); Sinclair Refining Co. v. Midland Oil Co., 55 F.2d 42, 45 (4th Cir. 1932). As recently reaffirmed in the *West Virginia Highlands* case, the factors to be considered by the district court in exercising its discretion are as follows:

> [I]t is sufficient if the court is satisfied that there is a probable right and a probable danger and that the right may be defeated, unless the injunction is issued, and considerable weight is given to the need of protection to the plaintiff as contrasted with the probable injury to the defendant . . . .

441 F.2d at 235, quoting Sinclair Refining Co. v. Midland Oil Co., 55 F.2d 42, 45 (4th Cir. 1932). Hence, the usual test establishes three elements that must be satisfied in order to grant a preliminary injunction. First, the plaintiff must show a "probable right", i. e., a likelihood that plaintiff will prevail at a trial on the merits; second, a "probable danger that the right may be defeated" which requires a showing of irreparable injury should the injunction not be granted; and third, the need for protection of plaintiff's rights must clearly outweigh the possible injury to the defendant should the injunction issue—requiring a balancing of the equities between plaintiff and defendant. 7 Moore's Federal Practice ¶ 65.04 [1] (2d ed. 1974).

[11] The requirement of a showing of irreparable injury may, of course, be

modified by statute or other controlling principle of law. 7 Moore's Federal Practice ¶ 65.04 [1] (2d ed. 1974). In this case the ICC has applied for injunctive relief under section 1(20) of the Interstate Commerce Act, 49 U.S.C. § 1(20) (1970), to enjoin an alleged violation of section 1(18) of the Act. Since the right to an injunction is granted by statute, assuming a violation of section 1(18), the ICC need not show irreparable harm. *See* ICC v. Consolidated Freightways, 41 F.Supp. 651, 656 (D.N. D.1941); Long Island R.R. v. New York Cent. R.R., 185 F.Supp. 673, 677 (E.D.N.Y.1960) (dictum). *See also* 7 Moore's Federal Practice ¶ 65.04 [1] (2d ed. 1974). However, the lack of irreparable harm may nevertheless be a significant factor in determining the ultimate balance of the equities in favor of plaintiff or defendant by the exercise of the court's sound discretion.

 The likelihood of the ICC succeeding on the merits remains debatable at this stage of the case. Abandonment requires not only a cessation of service, but also an intention to cease service indefinitely or permanently. ICC v. Chicago, Rock Island & Pac. R.R., supra, 501 F.2d at 911; Meyers v. Jay Street Connecting R.R., 259 F.2d 532, 535 (2d Cir. 1958). Further, if cessation of service continues because of conditions over which ·the railroad has no control, there is no "abandonment" within the meaning of Section 1(18) of the Interstate Commerce Act. ICC v. Chicago, Rock Island & Pac. R.R., *supra,* 501 F.2d at 911. However, the abandonment should not be deemed "beyond the control" of the railroad if the unsafe track conditions that required cessation of service were caused by neglect of the railroad to properly maintain its rail line.

 Whether to grant relief is discretionary. Section 1(20) of the Act gives no absolute right to injunctive relief even if an illegal abandonment is shown. ICC v. Chicago, Rock Island, &

Pac. R.R., *supra* at 914; *see* Pennsylvania v. Penn Central Transp. Co., 348 F.Supp. 28 (M.D.Pa.1972); Asbury v. Chesapeake & O. Ry. Co., 264 F.Supp. 437 (D.D.C.1967).

 Once an unauthorized cessation of service by the railroad is established, the court must weigh the parties' respective injuries and balance the equities to determine, in the court's discretion, whether a preliminary injunction should issue. In exercising this discretion, the court should consider (1) the relative importance of the rights asserted and the act sought to be enjoined, (2) the preservation of the status quo, and (3) the balancing of damage and convenience generally. *See* Communist Party of United States v. McGrath, 96 F.Supp. 47, 48 (D.D.C.1951) (Bazelon, J., concurring); Sinclair Refining Co. v. Midland Oil Co., 55 F.2d 42, 45 (4th Cir. 1932). *See generally* 7 Moore's Federal Practice ¶ 65.04 [2] (2d ed. 1974).

In considering these factors in relation to the issues and evidence presented, several facts weigh heavily on the side of denial of the ICC's motion for the preliminary injunction.

 First, it must be kept in mind that the motion is for *mandatory* preliminary injunction. Such injunctions do not preserve the practical status quo, and normally should be granted in those circumstances when the exigencies of the situation demand such relief. In the court's judgment, they do not in this case.

Second, and perhaps the most disturbing aspect of this case, there has been a delay of nineteen months in the processing of B & A's petition for abandonment by the ICC. Further, counsel for the ICC is *unable to give even a rough* approximation as to when a hearing will be granted on the B & A's application for the certificate of abandonment, even though expedited hearing status has now been granted for the application. It further appears that the ICC has yet to determine whether an environmental im-

pact statement will be necessary in this case. Even assuming that B & A has wrongfully abandoned its line without prior approval of the ICC, this wilful delay by the ICC on B & A's abandonment proceedings, while at the same time pursuing remedies for injunctive relief in this court, substantially undermines the equitable position of the ICC.

Third, ICC appears to have been indifferent to B & A's *de facto* abandonments. In 1968, when the B & A discontinued service south of the Severn River, the ICC apparently took no action. In 1969, when B & A discontinued service south of Glen Burnie, the ICC again appears disinterested. B & A embargoed service south of the Patapsco River in June 1972 which appears to have provoked but limited interest on the part of the ICC until recently.

Fourth, over two years have elapsed since B & A ceased its service south of the Patapsco River until the filing of this suit. It is apparent from the record that in 1972 a complaint was prepared but not filed by which the ICC made the claims it now makes in this court. The ICC chooses not to explain why the suit was not filed in 1972 and it can hardly complain if the inferences drawn from its silence are adverse. Alco has eschewed the courts as an avenue of relief until the instant suit was filed in which it seeks to intervene. It is noteworthy in this regard that decision by the court on the requested preliminary injunction is within thirty days of the filing of the case. There is no reason to suppose that the time would have been appreciably longer had suit been filed at an earlier date.

Fifth, although it is plain that the B & A has for some time regarded its railroad operation as a burden, substantial damage to its rail facilities was inflicted by Agnes and this was the direct cause of the cessation of service. The bridge over the Patapsco could no longer be used without extensive repairs and portions of the track were washed out entirely.

Sixth, the cost of repairs necessary for restoration of service, while open to some doubt, is by every reckoning substantial. From the evidence presented, it appears that it would cost approximately $75,000 to repair the Patapsco bridge sufficiently to make it usable on an interim basis. Expert testimony placed the cost of work necessary to make the trackage safe for operation at $187,000 as of one year ago without allowance for contingencies. This figure might be higher because of inflation over the past year and any contingency conditions encountered in the actual work but not included in the estimate. There may be an appreciable reduction due to the fact that the estimate assumed an operating speed of up to 25 MPH whereas 10–15 MPH is the actual operating speed. To be sure, the vast majority of the trackage work may be needed because of deferred maintenance but a not insignificant portion of the work is directly attributable to Agnes.

Seventh, B & A clearly has the present financial ability to make the repairs necessary to restore service without recourse to outside financing. Additionally, outside financing may be available including a loan under the Emergency Rail Facilities Restoration Act, P.L. 92–591 Approved October 27, 1972. B & A notes that Congress did not implement the act by funding until July 1, 1973 some nine days before its abandonment petition was to be heard by the ICC. Because of the hearing on its pending application, B & A says it saw no reason to seek funds under the act. The sound financial condition of B & A does not result from the profitability of its railroad operations in recent years. For the preceding ten years, it claims a net loss on its railroad operations of $68,000. The profit and loss figures for the ten-year period are clearly subject to adjustments which would

reduce but by no means eliminate a net loss on railroad operations for the decade.

Eighth, Alco, which has never sought relief in court and does so now only by association with the ICC, urges that a preliminary injunction issue because it must commit to a renewal of its warehouse lease within thirty days for an additional one year term. The lease expires around January 1, 1975. The evidence indicates that work on the bridge would take three to four weeks for completion. Whether the bridge has deteriorated since the damage survey and, if so, whether additional repairs would be necessary is unknown. Additionally the repair work and the actual extent thereof as of the time of the damage survey would have to be preceded by a consulting engineer's examination and verification. The track work, irrespective of what necessitates the repairs is estimated to take four to five months. The innumerable variables involved in these factors clearly indicate, to the court at least, the improbability that service on the line could be restored within the time frames which Alco says are critical to it.

Ninth, Alco's costs have increased by approximately $100,000 annually because of the loss of rail service. A portion of this increase is passed on directly to certain of its customers and the balance is absorbed. Alco is not, however, without other legal remedies. It may seek damages for wrongful abandonment before the ICC. *See* 49 U.S.C. §§ 8, 9 (1970). On the other hand, if this court orders B & A to make repairs and restore service and thereafter the ICC approves the abandonment application, the expenditures by B & A may not be recovered.

On balance these considerations tip the scales in favor of denial of a preliminary injunction. The ICC has cited several cases in which *permanent* injunctions have been granted under circumstances having some similarity to the case at bar. *See, e. g.,* ICC v. Maine Cent. R.R., Civil No. 74–81 (D.Vt. July 18, 1974); ICC v. St. Johnsbury & Lamoille County R.R., Civil No. 73–3 (D. Vt. Feb. 1, 1973). It cites only one case in which a mandatory *preliminary* injunction has been granted under 49 U. S.C. § 1(20). Meyers v. Jay Street Connecting R.R., 259 F.2d 532 (2d Cir. 1958). In *Meyers*, however, there was no inordinate delay in the railroad's abandonment petition before the ICC, a hearing having been held about 90 days after the petition was filed. *Id.* at 534. Further, the railroad in *Meyers* was operating, albeit at a loss; the B & A hasn't operated south of the Patapsco River for over two years. Clearly the equities are different in the case at bar and in *Meyers*.

After consideration of the law, the evidence and the balance of the equities, this court concludes that a preliminary injunction should not issue. The ICC has the expertise and was charged by Congress with determining when the public interest would be served by the grant or denial of applications affecting service. Mindful as the court is of the additional burdens which the ICC believes were imposed upon it by the National Environmental Policy Act, 42 U. S.C. § 4321 (1970), there comes a time when delay in decision by an administrative agency is tantamount to denial of an administrative remedy. The court is not likely to reach this case on the merits until early 1975. Under the peculiar facts and circumstances which this case presents, it is worth hoping that by that time the ICC will have reached a decision on the long pending application by B & A for abandonment. Asbury v. Chesapeake & O. Ry., 264 F.Supp. 437 (D.D.C.1967).

The court's findings of fact and conclusions of law as required by Rule 52(a), Fed.R.Civ.P., are contained herein and are without prejudice to contrary findings and conclusions being made at

the time of the hearing on the merits. An appropriate order will be entered separately granting Alco's motion to intervene and denying ICC's request for preliminary injunction.