INTERSTATE COMMERCE COMMIS-
SION, Plaintiff-Appellee,
and
Ethan Allen, Inc., et al., Intervenors,

v.

MAINE CENTRAL RAILROAD COM-
PANY, Defendant-Appellant.

No. 355, Docket 74-2062.

United States Court of Appeals,
Second Circuit.

Argued Oct. 2, 1974.

Decided Oct. 22, 1974.

Peter J. Nickles, Washington, D. C. (Eugene D. Gulland, and Covington & Burling, Washington, D. C., on the brief), for defendant-appellant.

John J. Mahoney, Jr., Interstate Commerce Commission, Washington, D. C. (Bernard A. Gould, Interstate Commerce Commission, Washington, D. C., on the brief), for plaintiff-appellee.

G. Clark Cummings, New York City (Kelley, Drye, Warren, Clark Carr & Ellis, New York City, on the brief), for intervenor-appellee Ethan Allen, Inc.

John T. Collins, Sp. Counsel for New Hampshire Public Utilities Commission, Boston, Mass.

Richard H. Saudek, Sp. Counsel for the State of Vermont, Montpelier, Vt.

Before HAYS, ANDERSON and MANSFIELD, Circuit Judges.

ROBERT P. ANDERSON, Circuit Judge:

The Maine Central Railroad Company (Maine Central), the appellant, is a common carrier subject to Part I of the Interstate Commerce Act, 49 U.S.C. § 1, et seq.; and it is operating under franchises granted by several states, including Vermont and New Hampshire. Through a combination of outright ownership and trackage agreements with the Boston and Maine Railroad and the Canadian National Railway, Maine Central operates a 57.52 mile rail line from Quebec Junction in Carroll, New Hampshire, to Beecher Falls, Vermont. This line is divided into four segments, the fourth or terminal segment is a 22.96 mile dead-end stretch, known as the Beecher Falls Branch, which is owned by Maine Central and extends from North Stratford, New Hampshire to Beecher Falls.[1] Except for approximately 1.5 miles in Vermont, all of this segment is located in New Hampshire, and the Maine Central is the only railroad which makes use of these tracks.

Prior to June 30, 1973, Maine Central's principal customers on the terminal segment were Ethan Allen, Inc., a furniture manufacturer, and the Woodland Division of the St. Regis Paper Company, a pulpwood processor.[2] In the early part of 1973, St. Regis notified Maine Central of its decision to terminate its operations in Beecher Falls at the end of June, 1973, which it thereafter did.

Following this announcement and a review of the current and former business and profitability of the entire 57.52 mile rail line from Quebec Junction to Beecher Falls, Maine Central's Board of Directors voted on June 27, 1973, to take the necessary steps to secure approval from the Interstate Commerce Commission (I.C.C.) to abandon this 57.52 mile portion of the railroad. At that time it was its intention to continue the operation of the line until its petition for abandonment had been decided.[3]

Before the Maine Central had completed its petition to the I.C.C., however, heavy rains on June 29, 30 and July 1, 1973, resulted in extensive flood damage to roadbed, culverts, bridges, tracks and other installations on the Beecher Falls Branch, which rendered this segment unsafe and inoperable. Consequently an embargo on all types of freight was for-

1. The first segment is owned by Maine Central but Boston & Maine Railroad has a purchase right on abandonment by Maine Central; the second segment is owned by the Boston and Maine and the third segment is owned by the Canadian National Railway Co. Over these two segments Maine Central has trackage rights.

2. According to Maine Central's abandonment petition Ethan Allen, Inc. shipped 579 carloads of furniture by rail from Beecher Falls in 1971 and 707 carloads in 1972, while St. Regis shipped 402 carloads of pulpwood by rail in 1971 and 288 carloads in 1972. See "Application of Maine Central Railroad Company for Certificate Permitting Abandonment of that Portion of its Branch Line of Railroad from Quebec Junction in the Town of Carroll, New Hampshire To Beecher Falls in the Town of Canaan, Vermont," Finance Docket No. AB-83, at 16–17.

3. The I.C.C. has not, according to its counsel, taken any official action on Maine Central's application for abandonment, filed July 19, 1973, and therefore pending for 15 months, because it had delayed the handling of all abandonment petitions while it awaited the final adjudication of Harlem Valley Transportation Association v. Stafford, 360 F.Supp. 1057 (S.D.N.Y.1973), aff'd at 500 F.2d 328 (2 Cir. 1974), which requires an environmental impact statement under the National Environmental Policy Act, 42 U.S. C. §§ 4321–4347 to be prepared by the I.C. C. as a condition precedent to the approval of an abandonment of a railroad line.

mally filed on July 3, 1973 on behalf of Maine Central by the Association of American Railroads for the 22.96 mile length of the fourth or terminal segment. The embargo, amended in minor detail on July 13, 1973, was still in effect on March 20, 1974, when the I.C.C. filed its complaint in this action in the district court, in which it alleged that Maine Central had illegally abandoned the embargoed segment in violation of § 1(18) of the Interstate Commerce Act (49 U.S.C. § 1(18)).[4]

The I.C.C. sought a mandatory injunction under § 1(20) of the Act (49 U.S.C. § 1(20))[5] to compel the Maine Central to repair and operate the Beecher Falls Branch of the rail line and discontinue its illegal abandonment. The Public Service Board of the State of Vermont, Ethan Allen, Inc., and the New Hampshire Public Utilities Commission were allowed to intervene.

The district court found that, since the end of June, 1973, as the result of the flood damage and Maine Central's continued embargo, Ethan Allen, Inc., had been forced to ship by motor carrier at rates greatly in excess of those which it was required to pay in 1972 for shipments via Maine Central. The district court also found that Ethan Allen, Inc.'s Beecher Falls facility was specifically designed for product shipment by rail; a 700 foot rail siding was installed in 1964 at Ethan Allen, Inc.'s own expense as well as an indoor loading area that can accommodate nine railroad cars.

Because of its dependence on rail transportation, Ethan Allen, Inc., in the latter part of 1973 offered to pay Maine Central the sum of $30,000 (the estimate of damage contained in Maine Central's abandonment petition) to restore rail service to the Beecher Falls Branch. At the hearing before the district court Ethan Allen, Inc. increased its offer of assistance to $52,000 which equaled Maine Central's updated total storm and flood damage repair figure. It is not disputed that Maine Central has the resources in labor, material, equipment and financial means to repair the damage caused by the flood and to resume operations on the Beecher Falls Branch, and the district court specifically so found.

After the conclusion of the hearings in May and June of 1974, the district court denied Maine Central's motion to dismiss the complaint, granted a mandatory injunction requiring Maine Central to restore rail service on the embargoed section to the level provided prior to the flood, and ordered Ethan Allen, Inc. to contribute the proffered $52,000 to the

---

4. 49 U.S.C. § 1(18) provides in relevant part:

"No carrier by railroad . . . shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment."

5. 49 U.S.C. § 1(20) provides in relevant part:

"The Commission shall have power to issue such certificate as prayed for, or to refuse to issue it, or to issue it for a portion or portions of a line of railroad, or extension thereof, described in the application, or for the partial exercise only of such right or privilege, and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require. From and after issuance of such certificate, and not before, the carrier by railroad may, without securing approval other than such certificate, comply with the terms and conditions contained in or attached to the issuance of such certificate and proceed with the construction, operation, or abandonment covered thereby. Any construction, operation, or abandonment contrary to the provisions of this paragraph or of paragraph (18) or (19) of this section may be enjoined by any court of competent jurisdiction at the suit of the United States, the Commission, any commission or regulating body of the State or States affected, or any party in interest: . . . . ."

cost of repairing the storm and flood damage.[6]

A motion by Maine Central for a stay of the district court's order was, after a hearing, denied on August 8, 1974; and this court on August 16, 1974 denied Maine Central's motion for a stay pending appeal, but, on September 10, 1974, it ordered the appeal expedited.

In this court the Maine Central makes three points which are: (1) that the district court erred in finding that Maine Central had abandoned the Beecher Falls Branch in violation of 49 U.S.C. § 1(18); (2) that the district court should have deferred to the primary jurisdiction of the I.C.C. in resolving this dispute; and (3) that, in view of the posture of the case and the existing equities, the district court committed an abuse of discretion in granting mandatory injunctive relief.

The first of these involves the question whether Maine Central's continuation for over a year of its initially justifiable embargo of July 3, 1973, is warranted by the I.C.C.'s long failure to take action on Maine Central's abandonment petition, particularly despite Ethan Allen, Inc.'s willingness to advance the cost of repair, or constitutes, instead, an unlawful abandonment in violation of § 1(18) of the Interstate Commerce Act.

Maine Central argues that because the original cessation of service was brought about by storm and flood damage and through no voluntary act on its part and because it has not taken any action since that time which would render it unable to restore the damaged portion of line in question, the district court could not properly infer the "intent" necessary to a finding of unlawful abandonment under § 1(18). While the term "abandonment" is not defined anywhere in the Interstate Commerce Act, and although this court in Zirn v. Hanover Bank, 215 F.2d 63, 69 (2d Cir. 1954), cited by Maine Central, stated that "abandon-

ment" in the context of that case meant "to give up permanently," the later case of Meyers v. Jay Street Connecting Railroad, 259 F.2d 532 (2 Cir. 1958), held that an embargo could be an expression of an intention to suspend service indefinitely, and that, for the purposes of ¶(18) and ¶(20) of the Interstate Commerce Act, such an indefinite suspension was not conceptually distinguishable from a permanent discontinuance of service. See 259 F.2d at 535. At the time the district court rendered its decision, the embargo had been in effect for more than a year in spite of the fact the Railroad possessed the financial and physical ability to repair the damage and resume service.

■ It is, of course, understandable that Maine Central would like to seize the opportunity to rid itself of the marginal operation of the Beecher Falls Branch, without being compelled to expend its funds for the repair and restoration of the embargoed line without a prior determination by the I.C.C. of its abandonment petition—a decision which may render the restoration project entirely unnecessary. Nevertheless, Maine Central cannot be permitted to take the law in its own hands and it may not utilize the extraordinary remedy of an embargo, which should be a temporary measure, see Froehling Supply Co. v. United States, 194 F.2d 637, 641 (7 Cir. 1952); New Orleans Traf. & Trans. Bureau v. Miss. Valley Barge, 280 I.C.C. 105, 117 (    ), to accomplish its purpose and at the same time deny the public the protection which §§ 1(18) and 1(20) were designed to afford. A railroad has a duty under both the Interstate Commerce Act and under its state franchises to maintain and repair its lines and provide service thereon.

■ There is ample evidence in the record to support the thorough and well stated findings and conclusions of the trial court which held that the perpetua-

---

**6.** This was not a mere repayable advancement but an absolute contribution, limited to the actual cost of necessary and proper repairs to damage caused by the June, 1973, storm and flood and excluding such costs as deferred maintenance, depreciation, etc.

tion of the embargo and the lack of any action toward repair and restoration of the storm and flood damage and the restoration of freight service on the Beecher Falls Branch conclusively proved an intention on the part of the Maine Central permanently to discontinue the service, which under the circumstances constituted an unlawful abandonment of the 22.96 mile Branch.

■ ■ With regard to the appellant's second point, there is no merit in its assertion that the court should have abstained from taking the case and should have recognized primary jurisdiction in the I.C.C. to proceed with an administrative hearing and determination of the issues on the ground that the I.C.C. has long been recognized as having the power to issue an order annulling an embargo. On oral argument the appellant appeared to have retreated from this position and did not press it. This is just as well, because the claim borders on the frivolous. The statute, 49 U.S.C. § 1(20), specifically authorizes the courts to enjoin unauthorized abandonments by regulated railroads "at the suit of" certain designated parties in interest. Neither the language of § 1(20), nor the inclusion of the Commission itself as one of the designated parties in interest who are empowered to commence an action, supports the need or desirability of prior resort to I.C.C. administrative proceedings. Indeed, the Supreme Court has indicated that a suit under § 1(20) is the only means that the Commission or any other party in interest has to enforce § 1(18)'s requirement that there be no abandonment before the acquisition of a certificate. See Powell v. United States, 300 U.S. 276, 287, 57 S. Ct. 470, 81 L.Ed. 643 (1937). Furthermore, the doctrine of primary jurisdiction, as noted in United States v. Western Pac. R. Co., 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956), "applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; . . ." This doctrine can have no application where, as here, the very institution of suit in the courts by the relevant administrative body represents an exercise of its "special competence."

The appellant's third point is that the district court abused its discretion in balancing the equities in favor of ordering the repairs and the restoration of service on the Beecher Falls Branch. In support of its position it argues that it was inequitable for the court to restore the operation of a portion of the line from Quebec Junction to Beecher Falls which was the subject of the Railroad's then pending petition to the I.C.C. for abandonment, and that the public interest cannot require the Railroad to do this while it is waiting in good faith for the I.C.C.'s approval of the petition which "appears imminent." It also asserts that the district court did not find that the indefinite suspension of the operations on the branch injured or threatened to injure the public interest.

The discussion, supra, of appellant's first point on this appeal relates to and in large measure answers the questions it raises in its third point. There is no evidence in the record as to when in the near or distant future the I.C.C. will decide Maine Central's abandonment petition, nor is there anything which remotely indicates whether it will be granted or denied.

■ The appellant for the most part ignores the evidence relating to the business and transportation experiences of Ethan Allen, Inc. during the embargo and omits from its consideration of the equities Ethan Allen, Inc.'s contribution of $52,000 for the restoration of the branch. It does not dispute the district court's finding that Maine Central is one of the few financially solvent railroads in the Northeast. The court's power to enjoin an unauthorized abandonment in a suit brought by the I.C.C. (§ 1(20) of the Interstate Commerce Act) remains operative whether the de-

fendant has a petition for abandonment pending before the I.C.C. or not. The filing of or pendency of an abandonment application neither freezes nor legalizes a long drawn out embargo which has been transmuted into an unlawful abandonment.

The underlying question of the public interest in requiring the continuation of rail service, which is a marginal or deficit operation, on a particular section or branch of the railroad is an issue to be considered by the I.C.C. in connection with Maine Central's abandonment petition. That issue, though it was before the district court to a degree, was only considered for the limited purpose of determining whether it would be equitable to require the repair of the damaged and embargoed section and the restoration of service over it. The district court's judgment was not intended to be conclusively binding on the abandonment issue yet to be decided by the I.C.C. In the light of Ethan Allen, Inc.'s contribution of $52,000 the burden of restoration on the Maine Central cannot be said to be very heavy. There are probably only two expenses which the Railroad will incur. The first is any cost of repair in excess of the $52,000 which Maine Central estimated to be the cost of restoration as of the time of the hearings below. Such excess, due perhaps to inflation, should be attributed to Maine Central's unjustifiable delay in making the repairs and should, in all fairness, be borne by it. The second is the cost of operating the Beecher Falls Branch [7] until the Commission acts on appellant's abandonment petition. This too is an appropriate cost for the Railroad to

bear. But for the flood leading to the discontinuation of service, Maine Central would have carried this cost during the intervening months, and would be carrying it now.

The issuance of the injunction lay in the sound discretion of the district court. We find no abuse of that power, but conclude that the court properly balanced the equities and reached a fair and just disposition of the case.

The order of the district court is affirmed.

---

7. Anyone reading the record and briefs in this case should be forewarned that, although the district court in its opinion, the I.C.C. in its complaint and the intervenors in their complaints and memoranda, refer to the *Beecher Falls Branch* of the Railroad as the most northerly or terminal segment, sometimes called the fourth segment, which is 22.96 miles long and runs between North Stratford, New Hampshire, and Beecher Falls, Vermont, the plaintiff-appellant refers to the *Beecher Falls Branch* as the whole

line, 57.52 miles in length, which runs between Quebec Junction, New Hampshire to Beecher Falls, Vermont, which is the subject of Maine Central's abandonment petition. Why this was never clarified in the course of the trial or in the briefs or arguments on appeal is a mystery. In this court's discussion of the case the *Beecher Falls Branch* is recognized throughout as the northerly 22.96 miles of the line, which was the subject of the embargo.