**INTERSTATE COMMERCE COMMISSION, Plaintiff,**

v.

**CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY and Larry S. Provo, Defendants.**

**Civ. No. 75–138–2.**

United States District Court, S. D. Iowa, C. D.

Sept. 10, 1975.

Allen L. Donielson, U. S. Atty., and James R. Rosenbaum, Asst. U. S. Atty., Des Moines, Iowa, John J. Mahoney, Jr. (Trial Atty.), Bureau of Enforcement, ICC, Washington, D. C., for plaintiff.

Frank W. Davis, Jr., and Charles H. Dick, Jr., Des Moines, Iowa, Louis T. Duerinck and Stuart F. Gassner, C&NW Transp. Co., Chicago, Ill., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT

HANSON, Chief Judge.

This action was brought by the Interstate Commerce Commission to enjoin an alleged wrongful abandonment of a 30-mile branch line of railroad in central Iowa owned by the Chicago and North Western Transportation Company (North Western). Plaintiff instituted this action pursuant to 49 U.S.C. § 1(20) on May 29, 1975, seeking preliminary and permanent injunctive relief against the North Western and its president, Larry Provo. The matter of permanent injunctive relief came on for trial on August 19, 1975. This Court has jurisdiction by virtue of 28 U.S.C. §§ 1337 and 1345.

### FINDINGS OF FACT

1. Plaintiff Interstate Commerce Commission (the Commission) is an administrative agency of the United States created pursuant to Section 11 of the Interstate Commerce Act, 49 U.S.C. § 11 (1970), with specifically vested powers and duties respecting interstate commerce under that Act, including the power to bring this action.

2. Defendant North Western is a corporation organized under the laws of the State of Delaware with its principal place of business at 400 West Madison Street, Chicago, Illinois 60606. North Western is a common carrier by railroad within the meaning of Section 1(1) of the Interstate Commerce Act, 49 U.S.C. § 1(1), and is subject to the regulation provided in Part I of that Act, 49 U.S.C. § 1 et seq.

3. Defendant Larry S. Provo is the president of the North Western, with his offices located at 400 West Madison Street, Chicago, Illinois 60606.

4. North Western is an employee-owned company which commenced operations as a common carrier by railroad under the Interstate Commerce Act on June 1, 1972, following its acquisition of substantially all of the transportation assets of Chicago and North Western Railway Company, a Wisconsin corporation, and all rights and liabilities pertaining thereto, as authorized by the Commission. Pursuant to the terms of the Commission's authorization, North Western must maintain a contingency fund of cash or temporary cash and is prohibited from paying any dividends (other than stock dividends) to its shareholders until June 1, 1977. Thereafter, until June 1, 1982, North Western may pay dividends and make other distributions (other than stock dividends) not in excess of 8% per annum on capital and capital surplus which has been paid to it in cash, but cannot pay more than an aggregate of the excess over $25,000,000 of its consolidated net income since June 1, 1972, and may make any such payment only if, after giving effect to the payment, consolidated current assets are at least 110% of consolidated current liabilities.

5. As reflected in its decisions and reports during the past ten years the Commission views North Western (and its predecessor, Chicago and North Western Railway Company) as a marginal rail carrier with a limited earnings capacity but with potential for development into a financially viable carrier.

6. North Western is the owner of a branch line of railroad extending from Railroad Milepost 239.6 at Minerva Junction, Marshall County, Iowa, in a northwesterly direction to Milepost 269.6 near Roland, Story County, Iowa, a distance of 30.0 miles, commonly known as the Roland Subdivision or the Roland line. The Roland line is a part of North Western's operating division known as the Central Division.

7. The Roland line was constructed in the year 1881 by a predecessor of the Minneapolis & St. Louis Railway Company. Chicago and North Western Railway Company acquired substantially all of the transportation assets of the Minneapolis & St. Louis Railway Company, including the Roland line, in the year 1960. North Western acquired the Roland line from Chicago and North Western Railway Company on June 1, 1972.

8. The Roland line presently contains rail weighing 70 and 80 pounds per yard. This rail was laid secondhand in 1915 and subsequent years. The line was constructed on native soil without ballast. The Roland line will accommodate a maximum weight per car of 220,000 pounds, which effectively restricts the line from accommodating carloads of grain in anything larger than 40-foot boxcars. One hundred ton covered hopper cars have a gross weight of 263,000 pounds when fully loaded.

9. Six stations are located on the Roland line: namely, Minerva, located at Milepost 247.1; Clemons Grove (Clemons), located at Milepost 250.8; St. Anthony, located at Milepost 252.9; Zearing, located at Milepost 258.6; McCallsburg, located at Milepost 263.4; and Roland, located at Milepost 269.1. McCallsburg is also served by a line of the Chicago, Rock Island and Pacific Railroad Company; North Western is the only railroad serving the other stations on the Roland line.

10. Weather and track conditions permitting, train service on the Roland line during the past ten years has been scheduled to be provided once per week. Pursuant to the decision of operating officers of North Western's Central Division that the track was unsafe for train operations or did not meet the minimum requirements of the Federal Railroad Administration's track safety standards, the line has informally been taken out of service at certain times and was formally embargoed from October 21, 1968 through February 5, 1969. As a result of such service interruptions, train service has actually been provided on the

Roland line less than once per week. The train servicing the line originates at Marshalltown, Iowa, and operates to Roland and returns, a total distance of 67.2 miles.

11. In December, 1974, derailments began to occur with increasing frequency and the Roland line became impassable and unsafe for train operations in the opinion of the Division Manager of North Western's Central Division. These conditions, together with the inadequacy of the funds allocated by North Western's corporate management to the Central Division (as well as all of North Western's seven other operating divisions) for the maintenance and improvement of all track on the Division that needed maintenance and improvement, caused the Division Manager of the Central Division to request that the line be placed under embargo.

12. On December 27, 1974, traffic originating at or destined to all stations on the Roland line was embargoed, and the Roland line was taken out of service. The reason for embargoing the line given by North Western was that the trackage was in poor condition and not in compliance with Federal Railroad Administration standards. On January 9, 1975, the embargo was amended by inserting an expiration date of March 26, 1975. On March 10, 1975, the embargo was further amended by changing the expiration date to November 25, 1975. The line remains under embargo and out of service at the present time.

13. On January 31, 1975, North Western filed an application for a certificate of public convenience and necessity permitting abandonment of the Roland line with the Commission in accordance with the provisions of Section 1(18) of the Interstate Commerce Act, 49 U.S.C. § 1(18). The application was assigned Docket No. AB–1 (Sub No. 45) by the Commission. North Western has complied with all conditions precedent to action on such application by the Commission as prescribed by Section 1(18) of the Interstate Commerce Act and applicable rules and regulations of the Commission.

14. To date, the Commission has determined that issuance of a certificate of public convenience and necessity permitting the abandonment of the Roland line as requested by North Western in Docket No. AB–1 (Sub No. 45), will not constitute a major federal action having a significant effect upon the quality of the human environment. The Commission has also given the proceeding in Docket No. AB–1 (Sub No. 45) priority handling, and a final decision is expected within six months to ten months.

## CONCLUSIONS OF LAW

Two distinct issues are before the Court by way of this proceeding. First, it must be determined whether an abandonment within the meaning of 49 U.S.C. § 1(18) has occurred. Second, if an abandonment is found, the Court must then decide whether it should be enjoined. See I. C. C. v. Chicago, Rock Island & Pac. R.R., 501 F.2d 908, 911, 913–14 (8th Cir. 1974).

It is undisputed that the North Western ceased rail service to the various shippers on the Roland line in December of 1974. While the line is presently under embargo, no work is underway to repair those areas which have caused troubles in the past. The railroad made clear its intentions at the hearing before this Court: it will not resume service on the Roland line unless ordered to do, either by this Court or the Commission. Under these circumstances, the Court would be hard pressed to conclude that an abandonment has not occurred.

■■ It is true, however, that a cessation of operations caused by factors beyond the North Western's control would not give rise to an abandonment under 49 U.S.C. § 1(18). I. C. C. v. Chicago, Rock Island & Pac. R.R., supra, at 911. In this regard, the railroad proffered evidence to the effect that the antiquated nature of the line, combined with adverse weather conditions, made the stoppage unavoidable. The Court cannot accept this contention. "[An] abandonment should not be deemed 'beyond the control' of the railroad if the

unsafe track conditions that required cessation of service were caused by neglect of the railroad to properly maintain its rail line." *I. C. C. v. Baltimore & Annapolis Railroad Co.*, 64 F.R.D. 337, 343 (D.Md.1974). The evidence strongly indicates that the Roland line was deemed to be unprofitable by railroad management, and hence has not received proper maintenance for a number of years. This neglect was a prime factor in causing the deterioration which has made the line largely impassable. Further, while the line has been under embargo and out of service for eight months, no steps toward rehabilitation have yet been taken. Moreover, the railroad has not shown that the "emergency" conditions which forced the embargo still exist. *See I. C. C. v. Maine Central R.R. Co.*, 505 F.2d 590, 593 (2d Cir. 1974).

Numerous photographs admitted into evidence in this case show the Roland line to be in dire need of repairs. Testimony from shippers whose businesses abut the line established that no substantial repair work has been undertaken in the last ten years. The North Western's Vice-President of Operations referred to the line as "obsolete." [1]

The cumulative effect of this evidence forces the conclusion that the North Western's neglect of the Roland line for repair purposes, and its subsequent discontinuation of service on the line, have been intentional. The fact that a major cause of this neglect may be attributable to the limited finances of the railroad does not excuse what has happened. *See Meyers v. Jay Street Connecting R.R.*, 259 F.2d 532, 534, 536 (2d Cir. 1958). There has been no service on the Roland line since December of 1974, and there will be no further service on it unless and until the North Western is ordered to resume activity. The railroad, by having ceased service with the intent to do so indefinitely and permanently, has

abandoned the Roland line within the meaning of Section 1(18) of the Interstate Commerce Act. *See I. C. C. v. Chicago, Rock Island & Pac. R.R.*, supra, at 911; *I. C. C. v. Baltimore & Annapolis R.R.*, supra, at 343.

Section 1(18) states, in relevant part:

. . . [N]o carrier by railroad subject to this part shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment.

As previously noted, the North Western applied for such a certificate on January 31, 1975, and the Commission's decision-making process is presently underway.

Section 1(20) further provides:

. . . Any . . . abandonment contrary to the provisions of this paragraph or of paragraph (18) or (19) of this section may be enjoined by any court of competent jurisdiction at the suit of . . . the Commission.

Because an abandonment has preceded the granting of a Commission certificate, this Court must now determine whether to enjoin that abandonment pending the agency's determination of the issue on its merits. The propriety of the issuance of such an injunction lies within the discretion of the trial court, and the matter turns upon a balancing of the interests of the respective parties. *I. C. C. v. Chicago, Rock Island & Pac. R.R.*, supra, at 914–16.

This Court recognizes "the strong Congressional policy and substantial public interest in not permitting abandonment of railroad service without approval of the ICC was required by § 1(18)." *Id.* at 914. Nonetheless, the propriety of injunctive relief in this case will turn upon whether it would be equitable to

---

1. Even if restored to good condition, the present line could only accommodate 40-foot boxcars. These vehicles are considered to have a somewhat limited utility for the movement of grain in the future, given the emergence of 100-ton covered hopper cars.

require North Western to undertake the costs of repair to the line "when shortly thereafter the Commission may approve the railroad's abandonment application." Id.

By plaintiffs' own estimate, a proposed I.C.C. order on the abandonment question will be issued in early December. A final decision should be rendered within six months of that date. The I.C.C. has already determined the initial environmental impact aspects of the abandonment. Cf. I. C. C. v. Chicago, Rock Island & Pac. R.R., supra, at 916. Further, this particular case has been given "first priority" over all pending abandonment applications, of which there are approximately 240. Thus, the Court must conclude that the administrative decision-making process is well underway. This factor is a crucial one in determining the propriety of injunctive relief, for the injunction will only be in effect until the I.C.C.'s final decision on the merits. Much evidence was presented to the Court regarding the detrimental long-range economic effects a termination of rail service will have on the communities of Clemons, Zearing, St. Anthony, and Minerva. The pertinent time frame for this Court, however, is the next ten months. The question of whether or not the North Western should be allowed to cease service once and for all on the Roland line will be decided by the I.C.C. See I. C. C. v. Maine Central R.R. Co., supra, at 595. This Court will merely determine whether the railroad must provide service while that decision is pending.

Considering all the evidence presented at the three-day trial in this case, it is the Court's conclusion that forcing the North Western to activate the Roland line pending a decision on the merits will cause the railroad more harm than it will do the shippers good. Accordingly, the Court deems that plaintiff's request for permanent injunctive relief must be denied.

The cost factor is a key element of this conclusion. Estimates varied concerning the expenses involved in getting the Roland line back in operation. The minimum figure projected was $183,000. This amount would restore the line to its condition in late 1974. In that condition, however, derailments will most probably occur, and the line will not meet the class one standards of the Federal Railroad Administration. These standards are based on an operating speed of 10 miles per hour. In late 1974 trains were operating at approximately half that speed, and the line still experienced a number of derailments. Additionally, constant subsequent repairs would be required to maintain even this level of operation.

Exhibit D–3 of the defendants sets $790,000 as the cost of rehabilitating the line to class one standards (10 mph. operation). With deductions for the salvage value of usable ties, rails and tie plates now on the line, the amount is reduced to $650,000. Given the high incidence of accidents on the line in 1974, the Court deems that a rehabilitation to the condition then-existing would be inadequate to satisfy the needs of the various shippers on the line. Plaintiff's witnesses expressed a desire for prompt, dependable service. The Court concludes that this can be satisfied only through efforts which are directed toward reaching the class one standards. Accordingly, $650,-000 is accepted as the approximate cost to the defendant to achieve this result.[2]

Directly related to the costs of restoring the line is the financial condition of

---

2. While there is conflicting evidence on the point, Roland line shippers apparently offered at one time to absorb a portion of this cost. Testimony varied on the amount of their contribution, placing it between $100,000 and $150,000. The Court is unclear as to whether this offer still stands at the present time. Even if it does, however, the North Western would be subject to substantial costs itself.

Cf. I. C. C. v. Maine Central R.R. Co., 505 F.2d 590 (2d Cir. 1974) (Where the line's major shipper, Ethan Allen, Inc., offered to contribute the costs of restoration of a branch line in a similar context. The district court enjoined the abandonment, but in doing so ordered the shipper to pay $52,000 as full restoration costs.)

the railroad. Plaintiff does not contend that the North Western can painlessly incur these costs out of readily available funds. The parties have stipulated that the North Western is viewed "as a marginal rail carrier with a limited earning capacity" by the I.C.C. It was further stipulated that the railroad had a "net railway operating deficit of "3.9 million" during the last half of 1974, and is currently suffering from a cash shortage. Under these circumstances, it is apparent that even an expense of just under $200,000 would create difficulties for the North Western, and most likely cause the line to seek other areas in which to curtail expenses. An outlay to achieve the regular service made possible by class one compliance would greatly increase the North Western's present financial woes. *Cf. I. C. C. v. Baltimore & Annapolis R.R. Co.*, 64 F.R.D. at 344. ("B & A clearly has the present financial ability to make the repairs necessary to restore service without recourse to outside financing.")

The harm which will befall shippers along the Roland line if an injunction does not issue is much less tangible. The Court heard the testimony of a number of grain elevator operators whose facilities are particularly suited to the weekly rail service formerly provided on the Roland line. The Court does not doubt that these people will suffer substantial harm if the North Western permanently shuts down. The Court's concern, however, is with the harm they will suffer in the next year. Viewed in this context, their situations are not so traumatic. Six witnesses testified as to their dependence on the Roland line for the movement of corn and soybeans. No witness stated that the Roland line was his sole source of transportation, however. Two competitive alternatives exist: trucks and other rail lines. Both alternatives, given proper market conditions, can and do offer more desirable means to transport grain than does the Roland line.

The superiority of competing rail service stems from the fact that the Roland line is built to accommodate 40-foot boxcars. Grain can be shipped more cheaply in the larger volume made possible by 100-ton covered hopper cars, or by the 25–50 car trains which service other stations. Roland line shippers must compete with the nearby multiple-hopper car loading points of Jewell, Story City, Nevada, Pickering, and Liscomb. In periods of peak demand, shipping costs via these higher volume points can undercut the rates available to the boxcar facilities on the Roland line. Similarly, in times of low demand, truck prices become competitive, and often superior to rail prices. While these observations suffer from the inherent defects of generality, they do serve to emphasize the point that the woes of the shippers who testified before this Court stem from more complex causes than the mere cessation of Roland line service.[3] It is this Court's conclusion, based on the testimony at trial of the Roland line shippers, that the harm they will suffer in the next year as a result of the North Western's abandonment is mostly speculative. The alternatives of available truck and higher volume rail service will ensure that the grain from the Roland line market area will keep moving. Moreover, because of the nature of the grain market, it is impossible to say how much of it would be shipped on the Roland line, if such service were available.[4]

3. The statement of shipper Marvin H. Christensen illustrates the effects market conditions can have on the costs of grain transportation. In 1972, a year of high volume movement of grain, the Clemons elevator shipped 989.57 tons of grain by truck. Had rail service been available, 962 of those tons would have moved by rail. In 1970, however, only 96 of a total of 667.14 tons which went by truck would have been shipped by rail. *See* Attachment # 2–1 to Plaintiff's Memorandum in support of preliminary injunction, filed on May 29, 1975.

4. Should one particular shipper suffer damages which cannot be alleviated by the available alternative sources, the remedy of a damage suit would be available. *See I. C. C. v. Chicago, Rock Island & Pac. R.R.*, 501 F.2d at 916; *I. C. C. v. Baltimore & Annapolis R.R. Co.*, 64 F.R.D. at 345.

Closely tied to the factors of the cost to the railroad and harm to the shippers is the time element involved. As the United States Court of Appeals for the Eighth Circuit has recognized:

. . . [T]here are situations in which it would be inequitable to require restoration of service on a line where, caused through no fault of the railroad, the costs of restoration would be substantial, and the ICC could be expected to shortly determine whether abandonment would be authorized.

*I. C. C. v. Chicago, Rock Island & Pac. R.R., supra,* at 916.

Here, of course, the "fault" of the railroad is in issue. The North Western's neglect of the Roland line undeniably brought about a situation where regular rail service was not feasible. The railroad's poor cash position played a key role in this neglect, however, and awarding the injunctive relief sought by the plaintiff would further weaken the North Western's financial situation. This is especially true when the proximity of the I.C.C. decision on the merits is considered. Should an abandonment be denied by the I.C.C., the North Western's course for the future will be set. Cutbacks can be made in other areas, with the knowledge that the Roland line must be developed. Given the railroad's shaky financial status, an order requiring a large outlay of funds to revitalize a line that may soon be abandoned would be a rather cavalier treatment of the company's limited funds. To argue that the fact the abandonment has been enjoined will influence the I.C.C. to deny abandonment, and hence avoid a possible waste of funds, is to place this Court in the role of usurping the agency's function. The merits of the abandonment are the province of the Commission. *I. C. C. v. Maine Central R.R. Co., supra,* at 595.

This Court has accepted the representation of the parties that a final I.C.C. decision on abandonment of the Roland line will be made by next summer. The time to complete the steps necessary for class one compliance on the Roland line would take approximately that long. Given the impecunious state of the railroad, and the ability of the Roland line shippers to move their products via competitive alternative sources, this Court deems that it would be improvident to grant the injunctive relief requested by plaintiff.

Accordingly, it is hereby ordered that plaintiff's motion for permanent injunctive relief is overruled.

It is further ordered that this cause of action be dismissed.